Sophia Rios, SBN 305801
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel. 619.489.0300
Fax 215.875.4604
srios@bm.net

*Attorney for Plaintiffs*
[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **KRISHNENDU CHAKRABORTY, JESUS GUERRERO, MAUREEN YOUNG, RACHELLE BLAKE, SHERIDINE HARRIS, RHONDA MCDONALD, EMILY WRIGHT, BRYAN DAHL, KAREN NEEDHAM, and RACHEL MULLINS, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**VISA INC., VISA U.S.A. INC., AND VISA INTERNATIONAL SERVICE ASSOCIATION;**<br><br>**Defendants** | Case No. 3:21-cv-5302<br><br>**CLASS ACTION COMPLAINT**<br><br>(I) Unjust Enrichment;<br>(II) Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;<br>(III) Washington Consumer Protection Act, RCW § 19.86, et seq.;<br>(IV) Violations of the Illinois Consumer Fraud Act<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 3

THE PARTIES............................................................................................................ 8

    A.    Defendants ................................................................................8

    B.    Plaintiffs ..................................................................................8

FACTUAL ALLEGATIONS .................................................................................... 14

    A.    Overview of the Payment Card Foreign Exchange Market ........................14

    B.    Applicable Contractual Provisions.............................................16

        1. Member Bank Customer Agreements......................................... 16

        2. Visa Rules ................................................................... 17

    C.    Visa Imposed Inflated Foreign Exchange Rates in Violation of the Visa Rules.......................................................................................20

CLASS ACTION ALLEGATIONS ........................................................................... 21

CLAIMS FOR RELIEF ............................................................................................ 24

PRAYER FOR RELIEF............................................................................................ 30

DEMAND FOR JURY TRIAL.................................................................................. 31

---

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

Plaintiffs Krishnendu Chakraborty, Jesus Guerrero, Maureen Young, Rachelle Blake, Sheridine Harris, Rhonda McDonald, Emily Wright, Bryan Dahl, Karen Needham, and Rachel Mullins ("Plaintiffs"), allege the following claims for relief against Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa" or "Defendants").

## **INTRODUCTION**

1.     Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association are together a U.S.-based multinational financial services corporation that processes electronic funds transfers throughout the world through its electronic payments network (known as "VisaNet"), most commonly through Visa-branded credit cards, debit cards, and prepaid cards (collectively, "payment cards").

2.     Plaintiffs and members of the proposed Classes[1] are Visa payment card cardholders in the U.S. who were issued Visa-branded payment cards, and used those cards to transact in foreign currencies.

3.     Visa does not issue payment cards directly to consumers. Instead, it provides financial institutions with Visa-branded payment products that the financial institutions then use to offer payment cards to their customers.

4.     Visa requires the banks that issue Visa-branded payment cards (the "member banks" or "issuing banks") to agree to be bound by certain rules of Visa (the "Visa Rules," available at https://usa.visa.com/content/dam/VCOM/download/about-visa/visa-rules-public.pdf). These Rules provide, *inter alia*, that the foreign exchange ("FX") rates applied to consumer payment card transactions in foreign currencies for each day will either be wholesale FX market rates or a government-mandated rate. The vast majority of jurisdictions do not have government-mandated rates.

---
[1] The Nationwide Class and proposed alternative State Classes are referred to herein as the "Classes."

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

5.      The Visa Rules also provide that the member banks must provide specific disclosures to member bank payment card cardholders describing what FX rates will be imposed.

6.      Member banks require all of their cardholders, including Plaintiffs and members of the proposed Classes, to agree to the terms of standardized credit card agreements and debit card agreements (together, the "Cardholder Agreements") as a condition of being issued Visa-branded payment cards.

7.      The member banks include language referencing the Visa Rules in their Cardholder Agreements, promising their cardholders, including Plaintiffs and Class Members, that the FX rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.[2]

8.      Contrary to the Visa Rules and Cardholder Agreements, the FX rates applied to cardholder transactions do not represent rates available in the wholesale FX market.

9.      Further, even when the FX rates imposed by Visa are within the trading ranges of the individual currencies within the wholesale market for the applicable dates, the methods by which the rates are imposed are unfair, in bad faith, and therefore in violation of the Visa Rules and the Cardholder Agreements.

10.     Based on the language of the Visa Rules regarding exchange rates—and the identical language set forth in the Cardholder Agreements—cardholders reasonably expect (and are led to believe) that the banks will charge wholesale rates that bear some resemblance to the rates that Visa and the banks themselves receive when transacting in foreign currencies to facilitate the cardholders' transactions. In fact, however, the banks and

---

[2] Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. Visa does not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, it adjusts the rates to provide a profit for Visa. For all other currencies, the Visa Rules and the Cardholder Agreements provide that wholesale FX market rates must be applied.

-4-

Visa rarely engage in wholesale market transactions to facilitate the cardholders' transactions, but when they do, they will charge and/or be charged genuine wholesale rates. Visa settles much of the transactions by U.S. cardholders with foreign merchants in U.S. Dollars, meaning neither the banks nor Visa engage in any currency conversion at all. In these instances, the need for any currency conversion at all is a pure fiction, and any hidden charge for the same, and/or the manipulation of FX rates in breach of the Visa Rules and the Cardholder Agreements, is unlawful and unjustly enriches Visa to the detriment of Visa cardholders. While the price the U.S. cardholder was quoted was in a foreign currency at the point of sale, the cardholder's account was in fact debited in U.S. Dollars, and the foreign merchant was typically paid in the foreign merchant's domestic currency.

11.    Even in transactions that Visa actually settles in foreign currencies, the need for currency exchange is minimal. Visa is engaged in multilateral global transactions on a massive scale (*i.e.*, doing multiple transactions in both directions—*e.g.*, U.S. Dollars to Euros, and Euros to U.S. Dollars). As a result of all these transactions, Visa is constantly in possession of large amounts of various currencies. Given its own currency balances, Visa only needs to engage in foreign currency transactions to settle any *net* currency settlement requirements.

12.    In sum, the FX rates Visa imposes and that banks charge cardholders for foreign transactions are largely a fiction and represent a non-transparent charge. They bear no resemblance to any exchange rate obtained or which could be obtained by the banks or Visa in wholesale markets, as many times Visa exchanged no currency whatsoever (because the transaction was settled in U.S. Dollars or because Visa had foreign currency on hand to settle the transaction with the foreign merchant) or traded at spot or forward FX prices.

13.    Instead of approximating the issuing banks and Visa's actual costs of acquiring foreign currency to settle transactions, the rates Visa imposes and member banks charge consumers for FX transactions are designed to maximize profits for the banks and Visa. Specifically, the rates imposed vary based on the direction of the transaction, and are always in the banks' and Visa's favor. For example, for any given processing date, the rate

-5-

imposed for converting U.S. Dollars to Euros will be significantly different from the inverse rate for converting Euros to U.S. Dollars. In both instances, it will be outside—or at the very high end of—the daily ranges of wholesale market rates for each currency conversion. This means that the cardholder will always get the worst rate and Visa will always get the best rate.

14.     Wholesale FX market participants make offers to purchase foreign currencies (referred to as a "bid" price), sell FX (the "ask price"), and the difference between the bid and the ask is called the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

15.     Because the rates imposed by Visa need not be contemporaneous (*i.e.*, from a bid-ask at a given point in time on the wholesale market), the spread between the two rates imposed by Visa for each currency pair (e.g., the spread between the rates for Euros to U.S. Dollars and for U.S. Dollars to Euros) exceeds the normal bid-ask spread by considerable margins, much greater than those at any given point in time on the markets themselves. In other words, Visa and banks are creating a fictional bid-ask spread (the highest rate in the day versus the lowest rate in the day), and then manipulating the rate applied to Class Member transactions so that the members of the proposed Classes either always get the worst possible rate in either direction, or in fact are applied rates that are even outside of this fictional bid-ask spread, making it even worse for these consumers. This practice renders the promise of a rate from the wholesale markets illusory, as Visa is acting in a way no party to the contract would have reasonably expected—not to impose a bid-ask from the markets at any given point in time, but to impose a bid from one point in time, and an ask from an entirely different point in time—and then applying the worst possible rate for the cardholder in every case in both directions.

16.     This means that the FX rates imposed are excessively costly for cardholders and unreasonably profitable for the banks and Visa.

17.     Visa makes money on the difference between the rate it imposes on consumers to engage in the foreign transaction, and the rate (if any) Visa actually pays to

acquire the foreign currency used to settle the transaction. When transactions are settled in the consumer's home currency (where no foreign currency is used at all), Visa's hidden manipulation of the FX rates charged to cardholders enables Visa to profit at the expense of cardholders. Because Visa also receives a percentage of the value of each transaction as a processing fee, it also benefits directly from inflated transaction amounts.

18.    Members of the proposed Classes transacted millions of dollars in foreign currencies with their Visa-branded payment cards during the relevant time period. Visa's illegal conduct has caused Plaintiffs and the Class Members to pay more for foreign transactions than they would have paid if Visa had complied in good faith with its contractual obligations to charge wholesale FX market rates rather than contrived rates. Class Members paid more because the FX rates were less favorable than those promised in the relevant contracts (thereby diminishing Class Members' purchasing power) and also because Visa's conduct inflated the amount involved in each transaction, thereby causing Class Members to pay higher foreign transaction fees, which are usually charged as a percentage of the total transaction amount, and to pay more in credit card interest than they would have had to pay had the transaction value had not been improperly inflated.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Visa.

20.    The Court has personal jurisdiction over Visa because Visa's acts giving rise to Plaintiffs' claims took place, in substantial part, in California generally and this District specifically. Visa has continuously and systematically transacted FX in this District and throughout the United States. Visa is headquartered in, maintains its principal place of business in, and maintains offices in San Francisco.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Visa resides, transact business, is found, and has agents in this District. Additionally, a substantial part

1  of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial

2  portion of the affected interstate trade and commerce described herein has been carried out

3  in this District.

## INTRADISTRICT ASSIGNMENT

5      22.    Pursuant to L.R. 3-5(a), venue is proper in the San Francisco or Oakland

6  Division.

## THE PARTIES

### A.    Defendants

9      23.    Defendants Visa, Inc., Visa International Service Association, and Visa

10  U.S.A., Inc. are Delaware corporations with their principal place of business in San

11  Francisco, California. Defendants Visa, Inc., Visa International Service Association, and

12  Visa U.S.A., Inc. are collectively referred to herein as "Visa."

### B.    Plaintiffs

14      24.    Plaintiff Krishnendu Chakraborty is an individual and a resident of

15  Burlington, Massachusetts. During the relevant time period, Mr. Chakraborty engaged in

16  payment card transactions in Euros ("EUR") with his TD Bank issued Visa-branded debit

17  card. During the relevant time period, Mr. Chakraborty also engaged in payment card

18  transactions in Euros ("EUR"), Indian Rupee ("INR"), and Swiss Francs ("CHF") with his

19  Capital One issued Visa-branded credit card. In violation of the Visa Rules and TD Bank's

20  and Capital One's agreements with Mr. Chakraborty, Visa imposed rates for Mr.

21  Chakraborty's transactions that were outside the range of bid-ask spreads on wholesale

22  market rates (for some transactions) and at the very high end of wholesale rates (for other

23  transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to Indian Rupee

24  ("USD/INR"), and U.S. Dollar to Swiss Francs ("CHF/USD") exchange rates. Visa

25  imposed these rates not in good faith, but in an effort to maximize Visa's profits at Mr.

26  Chakraborty's expense, in violation of the Visa Rules and Mr. Chakraborty's reasonable

27  expectations that Visa would act in good faith in imposing exchange rates. The FX rates

28  that Visa imposed on Mr. Chakraborty's transactions were more costly to Mr. Chakraborty

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Mr. Chakraborty and TD Bank and between Mr. Chakraborty and Capital One.

25.    Plaintiff Jesus Guerrero is an individual and a resident of Los Angeles County, California. During the relevant time period, Mr. Guerrero engaged in payment card transactions in Mexican Pesos ("MXN") with his Bank of America issued Visa-branded debit card. In violation of the Visa Rules and Bank of America's agreements with Mr. Guerrero, Visa imposed rates for Mr. Guerrero's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Mexican Peso ("USD/MXN") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Mr. Guerrero's expense, in violation of violation of the Visa Rules and Mr. Guerrero's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Mr. Guerrero were more costly to Mr. Guerrero than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Mr. Guerrero and Bank of America.

26.    Plaintiff Maureen Young is an individual and a resident of Maineville, Ohio. During the relevant time period, Ms. Young engaged in payment card transactions in Canadian dollars ("CAD") and British Pounds ("GBP") with her Bank of America issued Visa-branded credit card. During the relevant time period, Ms. Young also engaged in payment card transactions in Euros ("EUR"), British Pounds ("GPB"), and Canadian dollars ("CAD") with her Chase issued Visa-branded credit card. In violation of the Visa Rules and Bank of America's and Chase's agreements with Ms. Young, Visa imposed rates for Ms. Young's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Canadian dollar ("USD/CAD") and U.S. Dollar to British Pound ("GBP/USD") exchange rates. Visa imposed these rates not in good faith, but in an

effort to maximize Visa's profits at Ms. Young's expense, in violation of the Visa Rules and Ms. Young's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Young were more costly to Ms. Young than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Ms. Young and Bank of America and between Ms. Young and Chase.

27.   Plaintiff Rachelle Blake is an individual and a resident of Orange County, California. During the relevant time period, Ms. Blake engaged in payment card transactions in Euros ("EUR"), British Pounds ("GPB"), and New Zealand dollars ("NZD") with her Bank of America issued Visa-branded debit card. In violation of the Visa Rules and Bank of America's agreements with Ms. Blake, Visa imposed rates for Ms. Blake's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to British Pound ("GBP/USD"), and U.S. Dollar to New Zealand dollar ("NZD/USD") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. Blake's expense, in violation of the Visa Rules and Ms. Blake's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Blake were more costly to Ms. Blake than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to Visa Rules and the Cardholder Agreement between Ms. Blake and Bank of America.

28.   Plaintiff Sheridine Harris is an individual and a resident of Los Angeles County, California. During the relevant time period, Ms. Harris engaged in payment card transactions in Euros ("EUR"), Canadian dollars ("CAD"), Chinese Yuan ("CNY"), Australian dollars ("AUD"), Japanese Yen ("JPY"), and Trinidad and Tobago dollars ("TTD") with her Bank of America issued Visa-branded debit card. In violation of the Visa Rules and Bank of America's agreements with Ms. Harris, Visa imposed rates for Ms. Harris's transactions that were outside the range of bid-ask spreads on wholesale market

-10-

rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to Canadian dollar ("USD/CAD"), U.S. Dollar to Chinese Yuan ("USD/CNY"), U.S. Dollar to Australian dollar ("AUD/USD"), U.S. Dollar to Japanese Yen ("USD/JPY"), and U.S. Dollar to Trinidad and Tobago dollar ("USD/TTD") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. Harris's expense, in violation of the Visa Rules and Ms. Harris's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Harris were more costly to Ms. Harris than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Ms. Harris and Bank of America.

29.     Plaintiff Rhonda McDonald is an individual and a resident of Harris County, Texas. During the relevant period, Ms. McDonald engaged in payment card transactions in Euros ("EUR"), and Canadian dollars ("CAD"), with her Bank of America issued Visa-branded debit card. In violation of the Visa Rules and Bank of America's agreements with Ms. McDonald, Visa imposed rates for Ms. McDonald's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), and U.S. Dollar to Canadian dollar ("USD/CAD"). Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. McDonald's expense, in violation of the Visa Rules and Ms. McDonald's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. McDonald were more costly to Ms. McDonald than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Ms. McDonald and Bank of America.

30.     Plaintiff Emily Wright is an individual and a resident of Seattle, Washington. During the relevant time period, Ms. Wright engaged in payment card transactions in Euros ("EUR"), Croatian Kuna ("HRK"), and British Pounds ("GBP") with her Capital One issued

Visa-branded credit card. In violation of the Visa Rules and Capital One's agreements with Ms. Wright, Visa imposed rates for Ms. Wright's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("EUR/USD"), U.S. Dollar to Croatian Kuna ("USD/HRK"), and U.S. Dollar to British Pound ("GBP/USD") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. Wright's expense, in violation of the Visa Rules and Ms. Wright's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Wright's transactions were more costly to Ms. Wright than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreements between Ms. Wright and Capital One.

31.     Plaintiff Bryan Dahl is an individual and a resident of Victorville, California. He was formerly a resident of Illinois and lived in Illinois when the relevant transactions were made. During the relevant time period, Mr. Dahl engaged in payment card transactions in Euros ("EUR") with his Chase issued Visa-branded credit card. In violation of the Visa Rules and Chase's agreements with Mr. Dahl, Visa imposed rates for Mr. Dahl's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Mr. Dahl's expense, in violation of the Visa Rules and Mr. Dahl's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Mr. Dahl's transactions were more costly to Mr. Dahl than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreement between Mr. Dahl and Chase.

32.     Plaintiff Karen Needham is an individual and a resident of Eugene, Oregon. Ms. Needham engaged in payment card transactions in Euros ("EUR") and British Pounds

("GPB") with her Chase issued Visa-branded credit card. In violation of the Visa Rules and Chase's agreements with Ms. Needham, Visa imposed rates for Ms. Needham's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates and U.S. Dollar to British Pounds ("USD/GBP") exchange rates. Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. Needham's expense, in violation of the Visa Rules and Ms. Needham's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Needham's transactions were more costly to Ms. Needham than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreement between Ms. Needham and Chase.

33.     Plaintiff Rachel Mullins is an individual and a resident of Los Angeles, California. Ms. Mullins engaged in payment card transactions in Euros ("EUR"), Indian Rupee ("INR"), and United Arab Emirates Dirham ("AED") with her Chase issued Visa-branded credit card. In violation of the Visa Rules and Chase's agreements with Ms. Mullins, Visa imposed rates for Ms. Mullins's transactions that were outside the range of bid-ask spreads on wholesale market rates (for some transactions) and at the very high end of wholesale rates (for other transactions) for U.S. Dollar to Euro ("USD/EUR") exchange rates, U.S. Dollar to Indian Rupee ("USD/INR") exchange rates, and U.S. Dollar to United Arab Emirates Dirham exchange rates ("USD/AED"). Visa imposed these rates not in good faith, but in an effort to maximize Visa's profits at Ms. Mullins's expense, in violation of the Visa Rules and Ms. Mullins's reasonable expectations that Visa would act in good faith in imposing exchange rates. The FX rates that Visa imposed on Ms. Mullins' transactions were more costly to Ms. Mullins than they would have been if the rates had been imposed reasonably from within the wholesale market rate range pursuant to the Visa Rules and the Cardholder Agreement between Ms. Mullins and Chase.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

**FACTUAL ALLEGATIONS**

**A.      Overview of the Payment Card Foreign Exchange Market**

34.     When a U.S. consumer makes a payment card transaction in U.S. Dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to Visa's electronics payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired. The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Visa sets default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

35.     When a U.S. consumer makes a payment card transaction in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited for the transaction in either its home currency or some other agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, Visa performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is determined by Visa.

36.     The exchange rate used by Visa to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to Visa and Visa accepts that information.

37.     For many payment card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. Issuing

banks generally charge foreign transaction fees ranging from 0% (*i.e.*, no foreign transaction fee) to 3%.

38.     Payment card contracts between consumers and issuing banks provide that conversion rates for foreign transactions will be determined by Visa pursuant to Visa's operating procedures. Visa's operating procedures for currency conversions are set forth in the Visa Rules.

39.     The largest participants in the wholesale FX market are dealer banks such as JPMorgan, Deutsche Bank, Citigroup, Barclays, UBS, and HSBC. Dealer banks trade foreign currency with each other and with other large financial institutions including Visa. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

40.     Visa also engages in foreign currency transactions with dealer banks. Visa engages in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations,[3] and to obtain currencies necessary to cover cardholders' foreign currency payment card transactions.

41.     However, Visa does not engage in parallel foreign currency transactions on the wholesale FX market for individual cardholder transactions, either on a per-transaction basis, or even on a daily basis.

42.     Instead, Visa maintains derivative contracts and reserves of currency and move funds between reserves as needed.[4]

---

[3] *See infra* n.11.

[4] "The Company uses foreign exchange forward derivative contracts to reduce its exposure to foreign currency rate changes on forecasted non-functional [i.e. non-U.S. dollar] currency denominated operational cash flows." *See* Visa Inc., 2020 Form 10-K, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/0504ac14-a3a0-4506-9352-aa15cd087268.pdf, at 71 (last accessed July 2, 2021).

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

43.     As one court found, Visa also incurs "minimal currency conversion costs." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *28 (Cal. Super. Ct. Apr. 7, 2003).

44.     Because Visa generally settles foreign transactions in both directions for a given currency pair (*e.g.*, Visa has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), Visa is only required to "settle" the net amount of each given currency for each day. In other words, if Visa processed $1 billion in transactions from Euros to U.S. Dollars and the same amount from U.S. Dollars to Euros on a particular day, Visa would not need to engage in any actual FX transactions in the wholesale market on that day.

45.     Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (i.e., Euros), Visa settles the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars. Visa has no foreign exchange risk for these transactions. The idea that the consumer purchases in a foreign currency in such a transaction is a pure fiction.

46.     For all these reasons, the rates that Visa charges cardholders are not representative of the rates Visa actually pays for foreign currency. Nor are they reflective of any other costs associated with currency conversion that Visa bears. Instead, Visa and the banks are engaged in arbitrage: they set rates to maximize profits—and do so without regard to the terms of the contracts that they imposed on member banks and card members.

**B.      Applicable Contractual Provisions**

**1.      Member Bank Customer Agreements**

47.     The contractual obligations between member banks and their payment card cardholders—including Plaintiffs and members of the proposed Classes—are set forth in each bank's Cardholder Agreements. The Cardholder Agreement is provided to credit card and debit card applicants who must accept the terms prior to the issuance of each card.

48.   Visa's relationships with the issuing banks are also governed by written agreements. These terms are memorialized in the Visa Rules and VISA Product and Service Rules.[5] Banks that issue Visa credit payment to their cardholders are referred to in the Visa Rules as the "Issuers."

49.   The Visa Rules expressly require member banks to include specific language in the member banks' Cardholder Agreements explaining how FX rates are determined for Visa payment card transactions. *See* Visa Rules at 81 (International Transaction or Currency Conversion Fee Disclosure).

50.   Specifically, the Visa Rules require member banks to state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect for the processing date. *See id.*

**2.**   Visa Rules

51.   Visa's Rules require issuing banks to make specific disclosures to consumers about how FX rates will be determined.

52.   Section 1.4.3.2 of the Visa Rules, as updated on October 17, 2020 and as in effect during the relevant period, provides:

An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:

A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives; [or]

The rate mandated by a government or governing body in effect for the applicable Processing Date

When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.

An Issuer may choose the method by which it notifies the Cardholder. This may

---

[5] Visa Core Rules and Visa Product and Service Rules, Oct. 17, 2020, *available at*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf (the "Visa Rules").

include one or more of the following, which may include electronic forms of communication:

Original Cardholder application agreement
Terms and conditions
Billing statement
Any other agreement between the Cardholder and the Issuer.

53.    As subsequently amended on April 17 2021, Section 1.4.3.2 of the Visa Rules now provides:

An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:

- **Effective through 16 April 2021** A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives

- **Effective through 16 April 2021** The rate mandated by a government or governing body in effect for the applicable Processing Date

- **Effective 17 April 2021** A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Transaction, which rate may vary from the rate Visa receives

- **Effective 17 April 2021** The rate mandated by a government or governing body in effect for the applicable Transaction

When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.

An Issuer may choose the method by which it notifies the Cardholder. This may include one or more of the following, which may include electronic forms of communication:

- Original Cardholder application agreement

- Terms and conditions

- Billing statement

- Any other agreement between the Cardholder and the Issuer

54.    Despite the fact that its member banks' cardholder agreements are public, Visa does not monitor those agreements to ensure they comply with its Rules.  Many of

Visa's member banks fail to make the required disclosures to consumers. Bank of America, Chase, TD Bank and Capital One all fail to disclose:

That the rates will be "selected" by Visa for Visa's and the bank's sole benefit;

That, in many instances, the rate is fictitious in the sense of not being derived from an actual transaction and often being outside the range of prices in the wholesale markets because the transactions are being settled in the consumer's home currency, and that the rate "selected" by Visa will be different than the rate used to actually settle the transaction; and

That rates will vary depending on the direction of the currency exchange, and will not be selected from bid-ask rates available contemporaneously on the wholesale market, but will instead be selected for the sole purpose of maximizing the banks' and Visa's profits at the expense of cardholders.

55.     Capital One, Bank of America and Chase Bank all also fail to disclose that the rates the consumer receives may be different than the rate Visa receives.  TD Bank, on the other hand, states that the rate may vary from the rate Visa receives. Both failures are problematic as they both create the false impression that the Visa is engaging in transactions and getting a "rate"

56.     The current version of the Visa Rules defined "Transaction Date" as "The date on which a Transaction between a Cardholder and a Merchant or an Acquirer occurs." *Id.* at 848.

57.     The Visa Rules currently define "Processing Date" as "The date (based on Greenwich Mean Time) on which the Member submitted, and Visa accepted, Interchange data." *Id.* at 837.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

58. Regardless of whether Visa applies FX rates for the applicable Processing Date (for transactions prior to April 16, 2021) or the Transaction Date (for transactions after April 16, 2021), the Visa Rules require that the selected FX rates be either wholesale rates or a government mandated rate.

59. Visa mitigates foreign exchange risk by purchasing futures, and does not engage in daily trading to ensure its currency needs are satisfied.

**C.     Visa Imposed Inflated Foreign Exchange Rates in Violation of the Visa Rules**

60. Visa's exchange rate practices with respect to Visa-branded cards violate the Visa Rules and the Cardholder Agreements.

61. Contrary to the requirements set forth in the Visa Rules, the exchange rates which Visa imposed on Class Members on foreign currency transactions are not "wholesale market" rates. Instead, Visa imposes rates that are—for most currencies and on most dates—entirely outside of the range of wholesale market rates in a direction that is disadvantageous for the cardholders and advantageous for Visa and the issuing banks.

62. A detailed analysis of Visa's historical exchange rates during the relevant period demonstrates that on a majority of days and for a majority of currencies, Visa imposed exchange rates that fell outside of the daily range of wholesale currency market rates on the applicable processing date.[6]

63. For example, an analysis of the exchange rates applied by Visa to convert cardholder transactions from Euros to U.S. Dollars demonstrates that the rate imposed on consumers was higher than the range of rates available in the wholesale FX market for the applicable processing date on 94 percent of the dates for the period of September 2018 to August 2019. Visa's rates were within the range of rates available in the wholesale FX market on just 6 percent of those dates.

---

[6] *See* Visa Currency Exchange Calculator, *available at* https://usa.visa.com/support/consumer/travel-support/exchange-rate-calculator.html (*last accessed* Jun. 18, 2021).

64. Discovery will show that Visa's method for determining its rates is largely algorithmic, and that Visa's pattern of generating profits for itself by applying rates that are higher than those promised in Cardholder Agreements persisted throughout the relevant period, across currency pairs. Each such instance of Visa imposing rates outside the rates it promised in the Visa Rules and Cardholder Agreements injured Plaintiffs and Class Members and imposed an "overcharge."

65. The extent of the overcharge for each Plaintiff and Class Member Visa card transaction can be calculated using transactional data in the possession, custody, or control of Visa and the member banks; historical Visa rates from Visa's website; and historical wholesale FX market data from third-party providers. Any transactions that were not subject to an overcharge—including transactions that took place on the limited number of dates for which Visa applied an exchange rate that was within the range of rates available in wholesale FX market—can be easily identified from those data sets and excluded.

## **CLASS ACTION ALLEGATIONS**

66. Plaintiffs assert their claims on behalf of the following Nationwide Class:

**Nationwide Class:** All persons or entities with a Visa payment card who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

67. This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

68. Plaintiffs also allege the following alternative statewide subclasses (the "State Classes") in the event that the Court determines that any of the claims alleged on behalf of the proposed Nationwide Class are unsuitable for nationwide class treatment.

69. Plaintiffs Jesus Guerrero, Rachelle Blake, Sheridine Harris, and Rachel Mullins (the "California Plaintiffs") assert their claims on behalf of the following California Class:

**California Class:** All persons or entities with a Visa payment card residing in California who made a transaction in a foreign currency using

-21-

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

70.    Plaintiff Wright also asserts her claims on behalf of the following Washington Class:

**Washington Class:** All persons or entities with a Visa payment card residing in Washington who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

71.    Plaintiff Dahl asserts claims on behalf of the following Illinois Class:

**Illinois Class:** All persons or entities with a Visa payment card residing in Illinois who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives any Judge and judicial staff assigned to this case.

72.    <u>Numerosity</u>: The Classes are so numerous that joinder of all Class Members is impracticable.

73.    <u>Typicality</u>:  Plaintiffs' claims are typical of the Class Members' claims. Visa imposed FX rates on Plaintiffs in the same manner as other Class Members and did not vary its FX practices from consumer to consumer.

74.    <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Classes, have no known conflicts with other Class Members, and have retained counsel experienced in complex class action litigation.

75.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  These common questions include:

a.    Whether Visa breached its Visa Rules by charging exchange rates not authorized by the Rules or the Cardholder Agreements;

b.    Whether Visa was unjustly enriched by its conduct;

c.    Whether Visa's practices were deceptive, unconscionable, or unfair;

d.    Whether Visa's practices violated the claims for relief set forth below; and

-22-

e.   The proper measure of damages.

76.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Visa has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

77.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Visa's conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the amount of each Class Member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Visa's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class Members' claims in a single forum.

78.     The running of any statute of limitations has been equitably tolled by reason of Visa's fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Visa actively concealed from Plaintiffs and Class Members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Visa's actual risk of exchanging foreign currencies. Discovery of Visa's illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

79.     As a result of Visa's actions, Plaintiffs and Class Members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Visa's acts and omissions.

**<u>CLAIMS FOR RELIEF</u>**
**FIRST CLAIM FOR RELIEF**
**(On Behalf of California Plaintiffs and Proposed California Class)**
**Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200,** *et*
***seq.***

80.     The California Plaintiffs incorporate each allegation above as if fully set forth herein.

81.     Visa has engaged in unfair competition within the meaning of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*., because Visa's conduct alleged herein is unlawful, unfair, and fraudulent.

82.     California Plaintiffs and the members of the California Class are "persons" within the meaning of Section 17201 of the California Unfair Competition Law.

83.     The California Unfair Competition Law prohibits any unlawful and unfair business practices or acts. Visa's conduct, as alleged herein, constitutes an unfair business practice that occurred in connection with the marketing, advertisement, and sale of its credit card services.

84.     Visa's conduct, as described herein, violated the Unfair Competition Law's "unfair" prong because its conduct violates established public policy intended to regulate credit card services to consumers, and because it is immoral, unethical, oppressive, or unscrupulous and has caused injuries to California Plaintiffs and members of the proposed California Class that outweigh any purported benefit.

85.     As a direct and proximate cause of Visa's conduct, which constitutes unlawful and unfair business practices, as herein alleged, California Plaintiffs and members of the California Class have been damaged and suffered ascertainable losses, thereby entitling them to recover restitution and equitable relief, including disgorgement or ill-gotten gains, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available at law or equity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND CLAIM FOR RELIEF**
**Quasi-Contract/Restitution**
**(On Behalf of California Plaintiffs and Proposed California Class)**

86.     California Plaintiffs incorporate each allegation above as if fully set forth herein.

87.     As alleged above, for the large majority of all cardholder transactions during the Class Period, the currency conversion rates imposed by Visa on foreign currency transactions were not selected from either wholesale FX market rates or a government-mandated rate as required by the Visa Rules and the Cardholder Agreements.

88.     Although California Plaintiffs and members of the California Class did not enter into contracts with Visa directly, Visa has a quasi-contractual relationship with California Plaintiffs and members of the California Class because Visa requires member banks to falsely state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect for the processing date.

89.     Visa's misrepresentations and omissions regarding the currency conversion rates imposed by Visa caused California Plaintiffs and the California Class to sufferexchange rates on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct.

90.     California Plaintiffs and the California Class have conferred a benefit upon Visa in the form of overcharges on foreign currency payment card transactions. Visa retained the amounts of those overcharges and, therefore, wrongfully obtained a legal benefit. Visa collected these amounts to the detriment of California Plaintiffs and the California Class, and thus appreciated the benefit that in good conscience and equity Visa should not be entitled to retain.

91.     Therefore, it is inequitable and unjust for Visa to retain the profit, benefit, or compensation conferred upon them without paying to each of California Plaintiffs and the

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

California Class California Plaintiffs and the California Class the difference of the full value of the benefit compared to the value actually received.

92.     As a result of Visa's exchange rate practices described herein, Visa has been unjustly enriched by overcharging cardholders for foreign currency transactions. As a direct and proximate result of Visa's unjust enrichment, California Plaintiffs and the California Class are entitled to restitution and disgorgement of the profits, benefits, and other compensation obtained by Visa from its false and misleading conduct as alleged herein.

93.     As a result, Visa has been unjustly enriched at the expense of California Plaintiffs and the Nationwide Class. California Plaintiffs and the California Class therefore seek full disgorgement and restitution of the amounts Visa retained as a result of their unlawful and/or wrongful conduct alleged herein.

**THIRD CLAIM FOR RELIEF**
**Violations of the Washington Consumer Protection Act**
**RCW § 19.86, et seq.**
**(On Behalf of Plaintiff Wright and Proposed Washington Class)**

94.     Plaintiff Wright incorporates each allegation above as if fully set forth herein.

95.     Visa's conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of RCW § 19.86.202.

96.     Visa has been engaged in trade or commerce throughout the relevant period.

97.     Visa's conduct here was unfair and deceptive and Visa made false promises and concealed or omitted material facts. Visa imposed FX exchange rates for the sole purpose of maximizing Visa's profits rather than being authorized by a contract or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by the Visa Rules and included in the Cardholder Agreements did not disclose that Visa would impose rates beyond those allowed by the Visa Rules and the Cardholder Agreements.

98.     The Visa Rules and the Cardholder Agreements also created the objectively justified expectation that the spread between the rates imposed on foreign currency

exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Visa's profits, without regard to what normal wholesale market conditions would produce.

99.    Further, Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff Wright and members of the Washington Class were injured in the form of overcharges on FX payment card transactions.

100.    Visa's practices of applying overcharges to payment cardholder foreign currency transactions was continuous throughout at least the relevant period.

101.    As a direct and proximate result of Visa's unlawful conduct, Plaintiff Wright and members of the Washington Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct.

102.    As a result of Visa's violations of the Washington Consumer Protection Act, Plaintiff Wright and the Washington Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**Violations of the Illinois Consumer Fraud Act**
**(On Behalf of Plaintiff Dahl and Proposed Illinois Class)**

103.    Plaintiff Dahl incorporates each allegation above as if fully set forth herein.

104.    Visa's conduct alleged herein constitutes "unfair deceptive acts or practices" in violation of Ill. Comp. Stat. § 505/2.

-27-

105.   Visa's conduct here was unfair and deceptive and Visa made false promises and concealed or omitted material facts. Visa imposed FX exchange rates for the sole purpose of maximizing Visa's profits rather than being authorized by a contract or bearing any reasonable relationship to the corresponding risk of fluctuation in the foreign exchanges markets. The contractual language dictated by the Visa Rules and included in the Cardholder Agreements did not disclose that Visa would impose rates beyond those allowed by the Visa Rules and the Cardholder Agreements.

106.   The Visa Rules and the Cardholder Agreements also created the objectively justified expectation that the spread between the rates imposed on foreign currency exchanges in different directions on the same day would bear a reasonable relationship to the bid/ask spread experienced by participants in the FX wholesale market. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Visa's profits, without regard to what normal wholesale market conditions would produce.

107.   Further, Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were imposed at the extreme ends of the daily ranges wholesale FX market rates such that Plaintiff Dahl and members of the Illinois Class were injured in the form of overcharges on FX payment card transactions.

108.   Visa's practices of applying overcharges to payment cardholder foreign currency transactions was continuous throughout at least the relevant period.

109.   As a direct and proximate result of Visa's unlawful conduct, Plaintiff Dahl and members of the Illinois Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct.

As a result of Visa's violations of the Illinois Consumer Fraud Act, Plaintiff Dahl and the Illinois Class seek all available damages, including punitive damages, and attorneys' fees and costs pursuant to 815 Ill. Comp. Stat. § 505/10a.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(By Plaintiff Wright on Behalf of the Proposed Washington Class and Plaintiff Dahl on Behalf of the Proposed Illinois Class)**

110.    Plaintiffs Wright and Dahl incorporate each allegation above as if fully set forth herein.

111.    As alleged above, for the large majority of all cardholder transactions during the Class Period, the currency conversion rates imposed by Visa on foreign currency transactions were not selected from either wholesale FX market rates or a government-mandated rate as required by the Visa Rules and the Cardholder Agreements.

112.    Although members of the Washington and Illinois Classes did not enter into contracts with Visa directly, Visa has a quasi-contractual relationship with these Class members because Visa requires member banks to falsely state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect for the processing date.

113.    Visa's misrepresentations and omissions regarding the currency conversion rates imposed by Visa caused members of the Washington and Illinois Classes to incur overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct.

114.    Members of the Washington and Illinois Classes have conferred a benefit upon Visa in the form of overcharges on foreign currency payment card transactions. Visa retained the amounts of those overcharges and, therefore, wrongfully obtained a legal benefit. Visa collected these amounts to the detriment of members of the Washington and Illinois Classes, and thus appreciated the benefit that in good conscience and equity Visa should not be entitled to retain.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

115.   Therefore, it is inequitable and unjust for Visa to retain the profit, benefit, or compensation conferred upon them without paying to each of members of the Washington and Illinois Classes the difference of the full value of the benefit compared to the value actually received

116.   As a result of Visa's exchange rate practices described herein, Visa has been unjustly enriched by overcharging cardholders for foreign currency transactions.

117.   Visa retained the amounts of those overcharges and, therefore, wrongfully obtained a legal benefit. Visa collected these amounts to the detriment of members of the Washington and Illinois Classes, and thus appreciated the benefit that in good conscience and equity Visa should not be entitled to retain.

118.   As a result, Visa has been unjustly enriched at the expense of members of the Washington and Illinois Classes. Plaintiffs Wright and Dahl and members of the Washington and Illinois Classes therefore seek full disgorgement and restitution of the amounts Visa retained as a result of their unlawful and/or wrongful conduct alleged herein.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, asks for judgment against Defendants as follows:

a.   Certification of this action as a class action on behalf of the proposed Classes;

b.   Designation of Plaintiffs as Class Representatives;

c.   Appointment of undersigned counsel as Class counsel;

d.   Judgment in favor of Plaintiffs on all causes of action;

e.   Declaration that the practices complained of herein are unlawful;

f.   Injunction requiring Visa to cease and desist from engaging in the unlawful practices alleged herein;

g.   Damages in the form of all money improperly collected or received by Visa;

h.   Disgorgement of all amounts improperly collected or received by Visa;

-30-

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

1        i.   An award of pre-judgment and post-judgment interest as provided by law;

2        j.   An award of attorneys' fees and costs; and

3        k.   Any further remedy the Court may deem just and proper.

4                          **<u>DEMAND FOR JURY TRIAL</u>**

5        Plaintiffs hereby demand a trial by jury on all claims so triable.

6

7   Dated:  July 9, 2021                    Respectfully submitted,

8                                           By:  /s/Sophia Rios

9
                                            Sophia Rios, SBN 305801
10                                          BERGER MONTAGUE PC
                                            401 B Street, Suite 2000
11                                          San Diego, CA 92101
                                            Tel. 619.489.0300
12                                          Fax 215.875.4604
                                            srios@bm.net
13

14                                          E. Michelle Drake*
                                            BERGER MONTAGUE PC
15                                          1229 Tyler Street NE, Suite 205
                                            Minneapolis, MN 55413
16                                          Tel. 612.594.5933
                                            Fax 612.584.4470
17                                          emdrake@bm.net

18
                                            Eric L. Cramer*
19                                          BERGER MONTAGUE PC
                                            1818 Market Street, Suite 3600
20                                          Philadelphia, PA 19103
                                            Tel. 215.875.3009
21                                          Fax 215.875.4604
                                            ecramer@bm.net
22

23                                          *pro hac vice forthcoming

24                                          Attorney for Plaintiffs

25

26

27

28

                                    -31-