Sophia Rios, SBN 305801
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel. 619.489.0300
Fax 215.875.4604
srios@bm.net

*Attorney for Plaintiffs*
[Additional counsel listed on signature page]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **KRISHNENDU CHAKRABORTY, MAUREEN YOUNG, EMILY WRIGHT, RACHELLE BLAKE, and BRITTANY DELACRUZ, on behalf of themselves and all others similarly situated,** | Case No. 4:21-cv-5302-YGR |
| **Plaintiffs,** | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| **v.** | (I) Unjust Enrichment/Quasi-Contract; (II) Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (III) Violations of Washington Consumer Protection Act, RCW § 19.86, *et seq.*; (IV) Violations of Mass. Gen. Laws ch. 93A, §1, *et seq.*; and (V) Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* |
| **VISA INC., VISA U.S.A. INC., AND VISA INTERNATIONAL SERVICE ASSOCIATION,** | |
| **Defendants.** | **JURY TRIAL DEMANDED** |

Plaintiffs Krishnendu Chakraborty, Maureen Young, Emily Wright, Rachelle Blake, and Brittany Delacruz ("Plaintiffs"), allege the following claims for relief against Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association (collectively "Visa" or "Defendants").

1

## **INTRODUCTION**

2      1.      Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service

3  Association are together a U.S.-based multinational financial services corporation that

4  processes electronic funds transfers throughout the world through its electronic payments

5  network (known as "VisaNet"), most commonly through Visa-branded credit cards, debit

6  cards, and prepaid cards (collectively, "payment cards").

7      2.      Plaintiffs and members of the proposed Classes[1] are Visa payment

8  cardholders in the U.S. who were issued Visa-branded payment cards and used those cards

9  to transact in foreign currencies.

10     3.      Visa does not issue payment cards directly to consumers. Instead, it provides

11 financial institutions with Visa-branded payment products that the financial institutions then

12 use to offer payment cards to their customers.

13     4.      Visa requires the banks that issue Visa-branded payment cards ("member

14 banks" or "issuing banks") to agree to be bound by certain rules of Visa, the Visa Core

15 Rules and Visa Product and Service Rules ("Visa Rules").[2] These Rules provide, *inter alia*,

16 that the foreign exchange ("FX") rates Visa applies to consumer payment card transactions

17 in foreign currencies for each day will either be wholesale FX market rates or a government-

18 mandated rate. The vast majority of jurisdictions do not have government-mandated rates.

19     5.      The Visa Rules also provide that the member banks must provide specific

20 disclosures to member bank payment cardholders describing what FX rates will be imposed.

21     6.      Member banks require all of their cardholders, including Plaintiffs and

22 members of the proposed Classes, to agree to the terms of standardized credit card

23 agreements and debit card agreements (together, the "Cardholder Agreements") as a

24 condition of being issued Visa-branded payment cards.

25

26 [1] The Nationwide Class and proposed alternative State Classes are referred to herein as the "Classes."

27 [2] An excerpted version of the Visa Rules containing the applicable provisions, as updated
28 on October 17, 2020 and as in effect during the relevant period, is attached hereto as Exhibit A.

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

7. The member banks include language referencing the Visa Rules in their Cardholder Agreements, promising their payment cardholders, including Plaintiffs and Class Members, that the FX rates applied to foreign transactions will be either wholesale market rates or, in jurisdictions that have them, government-mandated rates.[3]

8. Contrary to the Visa Rules and Cardholder Agreements, the FX rates Visa applies to payment cardholder transactions are routinely worse than the worst rates in the wholesale FX market.

9. The rates Visa selects are excessive and unfair because they enable Visa to enrich itself in a way that is not reflective of any risk Visa assumed, or of any costs Visa incurred.

10. Visa's conduct is not authorized by the Cardholder Agreements, which constrain Visa's discretion to the use of wholesale market rates.

11. Wholesale FX market participants make offers to purchase (referred to as a "bid" price) and sell (the "ask" price) foreign currencies, with the difference between the bid and the ask known as the "bid-ask spread." Because the trading volume is so large, bid-ask spreads in the wholesale FX market are generally exceedingly small.

12. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

13. In selecting the rates to apply to FX transactions, Visa frequently selects rates that are outside the day's wholesale bid-ask trading range entirely. For example, on a

[3] Some countries use fixed exchange rate systems, sometimes called a pegged exchange rate, in which their respective currency's value is fixed or pegged by a monetary authority against the value of another currency, such as the U.S. Dollar. For example, the Bermudian dollar is pegged to the U.S. Dollar at a one-to-one ratio by the Bermuda Monetary Authority. Visa does not apply government-mandated exchange rates for foreign payment card transactions in the limited set of countries that have adopted fixed exchange rate systems; instead, it adjusts the rates to provide a profit for Visa. For all other currencies, the Visa Rules and the Cardholder Agreements provide that wholesale FX market rates must be applied.

-3-

given processing date, Visa will use a rate to convert U.S. Dollars to Euros that is worse than the worst rate wholesale market participants paid in U.S. Dollars for Euros on that day. For transactions involving converting Euros to U.S. Dollars on the same date, Visa does not use the inverse of the rate it used for U.S. Dollars to Euros. Nor does it apply a market-based "spread" between the two rates. Rather, Visa will select a rate to convert Euros to U.S. Dollars that is worse than the worst rate wholesale market participants paid in Euros for U.S. Dollars on that day.

14.     On the occasions where the rate that Visa uses for currency conversion in one direction falls within the range of rates that wholesale market participants paid to convert a given currency on a given day, *i.e.*, U.S. Dollars to Euros, the rate that Visa uses to convert U.S. Dollars to Euros (the "bid") is artificially divorced from the contemporaneous market rate that was quoted to convert Euros to U.S. Dollars (the "ask"), which means that the resulting "<u>spread</u>" is one which is completely outside the range of wholesale market spreads that ever existed on the applicable date.

15.     Visa creates these fictional FX rate spreads (found nowhere in the wholesale currency markets) by not selecting its wholesale market rates from a single moment in time in the wholesale currency market. Because the "rates" Visa chooses for a given currency pair are not chosen contemporaneously (*i.e.*, from a bid-ask at a given point in time on the wholesale market, which is how rates are actually quoted in the wholesale market), the spread between the two rates imposed by Visa for each currency pair (*e.g.*, the spread between the rates for Euros to U.S. Dollars and for U.S. Dollars to Euros) exceeds the wholesale market's bid-ask spread by considerable margins, resulting in spreads that are much greater than those that ever exist at any given point in time on the markets themselves. In other words, Visa and issuing banks create a fictional bid-ask spread (the highest rate in the day versus the lowest rate in the day), and then manipulate the rate applied to payment cardholders' foreign transactions so that the members of the proposed Classes get a "rate" worse than those available in the wholesale market.

16.     This practice renders the Visa Rules' promise of a rate from the wholesale markets (which is further promised in the Cardholder Agreements) illusory, as Visa is acting in a way no payment cardholder would have reasonably expected: Visa does not impose a bid-ask spread from the markets at any given point in time, but instead imposes a bid from one point in time, and an ask from an entirely different point in time—resulting in a spread that was found in the market at *no* point in time. In sum, even when the "bid" or the "ask" is one that can actually be found in the applicable wholesale markets, Visa's rate-selection process, which artificially divorces the bid and the ask from one another, results in the application of "rates" that provide Visa with a spread that far exceeds those available in the wholesale FX markets. This process cannot reasonably be said to result in cardholders receiving a rate selected from the wholesale markets, as the rates actually quoted in wholesale markets are quoted with a bid, an ask, and a resulting spread.

17.     Moreover, many of the U.S. cardholder transactions that Visa "converts" on the basis that they involve foreign currency never involve foreign currency at all because the transactions are settled in U.S. Dollars. In other words, while the merchant's price may have been denominated in a foreign currency, the cardholder's account was debited in U.S. Dollars, and the merchant was paid in U.S. Dollars (but not necessarily in the amount that the consumer was charged).

18.     Even for transactions that Visa settles in foreign currency, the need for currency exchange is minimal. Visa is engaged in multilateral global transactions on a massive scale (*i.e*., doing multiple transactions in both directions—*e.g*., U.S. Dollars to Euros, and Euros to U.S. Dollars). As a result of all these transactions, Visa is constantly in possession of large amounts of various currencies. Given its own currency balances, Visa only needs to engage in foreign currency transactions to settle any *net* currency settlement requirements. Visa mitigates foreign exchange risk by purchasing futures and does not engage in daily trading to ensure its currency needs are satisfied.

19.     Despite Visa's lack of currency exchange risk, Visa makes money as a result of charging consumers inflated rates in several ways. First, Visa receives processing fees

that are a percentage of the total transaction amount. So, when the transaction amount is inflated as a result of above-market rates being imposed, Visa receives higher processing fees. Second, Visa makes money on the difference between the rate it imposes on consumers to engage in the foreign transaction, and the rate (if any) Visa actually pays to acquire the foreign currency used to settle the transaction. Third, in circumstances where no foreign currency is involved at all, such as when transactions are settled in the consumer's home currency, Visa makes money based on the spread between what it charges the consumer (in U.S. Dollars) and what it pays the merchant (also in U.S. Dollars).

20.     In sum, the FX rates Visa imposes and that issuing banks charge payment cardholders for foreign transactions are largely a fiction and represent a non-transparent charge. Often, even when the bid and ask are viewed separately (in a way that they do not exist in the actual FX markets), the rates imposed by Visa are *still* worse than those paid by any wholesale market participant. In the instances when the bid and ask are viewed separately (in a way that they do not exist in the actual FX markets) and where the bid and the ask (separately) were within the range paid by wholesale market participants, the resulting *spread* bears no resemblance to any FX spread obtained or which could be obtained by issuing banks or Visa in wholesale markets.

21.     Instead of compensating the issuing banks and Visa for the actual costs or risks of acquiring foreign currency to settle transactions, Visa's selection of inflated and arbitrary FX rates results in Visa receiving compensation that bears no relationship to any risk it assumed or any service it provided.

22.     To be clear, Plaintiffs do not contend they are entitled to the *best* possible wholesale market rate. Rather, they contend they are entitled to a rate that *actually existed* in the wholesale market on the applicable date, and that Visa's conduct (which is not authorized by any agreement between Plaintiffs and Visa or Plaintiffs and their issuing banks) was unfair, unlawful, unjust, fraudulent, immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, because it imposed transaction costs on Plaintiffs and provided rewards to Visa that bear no relation to any service Visa

performed or to any risk Visa undertook. The harm caused to Plaintiffs and class members outweighs any purported benefit or utility.

23.     Members of the proposed Classes transacted millions of dollars in foreign currencies with their Visa-branded payment cards during the relevant time period. Visa's illegal conduct has caused Plaintiffs and the class members to pay more for foreign transactions than they would have paid if Visa had acted fairly and in good faith and conformance with what is disclosed in the Visa Rules and Cardholder Agreements in selecting the FX rates to be applied to such transactions, and unjustly enriched Visa in the process.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

24.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), in that this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from Visa.

25.     The Court has personal jurisdiction over Visa because Visa's acts giving rise to Plaintiffs' claims took place, in substantial part, in California generally and this District specifically. Visa has continuously and systematically transacted FX in this District and throughout the United States. Visa is headquartered in, maintains its principal place of business in, and maintains offices in San Francisco.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Visa resides, transacts business, is found, and has agents in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

**DIVISIONAL ASSIGNMENT**

27.     Pursuant to L.R. 3-5, the Divisional Assignment for this matter is appropriate in the San Francisco or Oakland Division, as San Francisco County is where Visa maintains its principal place of business.

1

**THE PARTIES**

2        A.    **Defendants**

3        28.    Defendants Visa, Inc., Visa International Service Association, and Visa

4   U.S.A., Inc. are Delaware corporations with their principal place of business in San

5   Francisco, California. Defendants Visa, Inc., Visa International Service Association, and

6   Visa U.S.A., Inc. are collectively referred to herein as "Visa."

7        B.    **Plaintiffs**

8             i.    **Plaintiff Krishnendu Chakraborty**

9        29.    Plaintiff Krishnendu Chakraborty is an individual and a resident of

10  Burlington, Massachusetts. During the relevant period, Mr. Chakraborty was the holder of

11  Capital One-issued, Visa-branded credit cards and engaged in at least 24 foreign

12  transactions using such cards between July 2019 and March 2020.

13       30.    Pursuant to the Visa Rules and Capital One's agreements with Mr.

14  Chakraborty, Visa agreed that in selecting a FX rate for each such transaction, it would

15  select a rate "from the range of rates available in wholesale currency markets for the

16  applicable Processing Date" for the transaction. *See infra* ¶ 135. However, for at least one

17  such transaction—and likely more given the pervasive nature of Visa's scheme (*see infra* ¶

18  149)—Visa instead selected a FX rate that was higher than the highest wholesale market

19  rate for the transaction's processing date.

20       31.    For example, Mr. Chakraborty's Capital One, Visa-branded credit card

21  statement shows that on July 15, 2019, he was charged $96.49 for a transaction for 85.50

22  Euros. The statement shows a FX rate of 0.886102187. No other date is reflected on the

23  statement related to the transaction.

24       32.    ███ ██ ███ █ ██ ██ ██ █ ██ █

25  ██████.

26       33.    ███████████████████

27  █████████████████████████

28       █████    This appears to be the same exchange rate that was posted on Visa's website

-8-

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

(after the fact, and with fewer decimals on the website version) for transactions processed on July 16, 2019.

34.     The inverse of the rate used by Visa █████████, which is **not** the rate reflected on Mr. Chakraborty's Capital One's statement (0.886102187). While the rate printed on the statement is very close to the exchange rate used, discovery will show that the exchange rates on Capital One's statements are simply the result of a mathematical calculation whereby the amount of the transaction in Euros was divided by the amount charged in U.S. Dollars.

35.     The FX rate that Visa imposed on Mr. Chakraborty's transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on both the (1) processing date and (2) the day before the processing date:

| Processing Date | Processing Date and Day Prior | Highest Rate Available in Wholesale Currency Markets for Processing Date and Day Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| ████████████ | ████████████ | ████████████ | ████████████ |

36.     Had Mr. Chakraborty's transaction been processed at the highest rate available in wholesale currency markets on the date his transaction was processed, he would have been charged ███████████████████████████████████████████████████████████████████████████████████████████████████████.

37.     Had Mr. Chakraborty's transaction been processed at the highest rate available in wholesale currency markets available on the day prior to the date his transaction was processed, he would have been charged ████████████████████████████████

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

1

2 ████████████████████████████████████████████████████.[4]

3      38.      In selecting an above-wholesale-market rate, Visa violated the rate-selection

4 procedures laid forth in the Visa Rules, as well as Mr. Chakraborty's reasonable

5 expectations that Visa would act in good faith in imposing exchange rates actually found in

6 the wholesale market. Visa maximized its profits at Mr. Chakraborty's expense.

7      39.      Visa's conduct caused Mr. Chakraborty to pay more for the transaction than

8 he would have paid had Visa selected a rate that was actually present in the wholesale

9 market.

10      40.      Mr. Chakraborty relied on his billing statement from Capital One, which set

11 forth this inflated amount, and paid the amount due. Had he known the whole truth, he

12 would not have paid the amount charged on the billing statement. Mr. Chakraborty's precise

13 damages for any other transactions where he was overcharged will be calculable once

14 Plaintiffs obtain discovery from Visa.

15           ii.    **Plaintiff Emily Wright**

16      41.      Plaintiff Emily Wright is an individual and a resident of Seattle, Washington.

17 During the relevant period, Ms. Wright was the holder of a Capital One-issued, Visa-

18 branded credit card and engaged in at least 29 foreign transactions using the card between

19 August 2019 and September 2019.

20      42.      Pursuant to the Visa Rules and Capital One's agreements with Ms. Wright,

21 Visa agreed that in selecting a FX rate for each such transaction, it would select a rate "from

22 _____

23 [4] ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ██████████████████████. The Court need not decide the propriety of that
procedure as to Mr. Chakraborty, as Mr. Chakraborty has stated a claim and shown damages
regardless of whether Visa is allowed to use ████████████

28 ████████████████████████████████████.

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

the range of rates available in wholesale currency markets for the applicable Processing Date" for the transaction. *See infra* ¶ 135. However, for at least one such transaction—and likely more given the pervasive nature of Visa's scheme (*see infra* ¶ 149)—Visa instead selected a FX rate that was higher than the highest wholesale market rate for the transaction's processing date.

43.     For example, Ms. Wright's Capital One, Visa-branded credit card statement shows that on September 7, 2019, she was charged $11.29 for a transaction for 10.20 Euros. The statement shows a FX rate of 0.903454384. No other date is reflected on the statement related to the transaction.

44.     ████████████████████████████████████████

████████████████████████████████.

45.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████. This appears to be the same exchange rate that was posted on Visa's website (after the fact, and with fewer decimal points on the website version) for transactions processed on September 10, 2019.

46.     The inverse of the rate used by Visa is ████████████, which is **not** the rate reflected on Ms. Wright's Capital One's statement (0.903454384). While the rate printed on the statement is very close to the exchange rate used, discovery will show that the exchange rates on Capital One's statements are simply the result of a mathematical calculation whereby the amount of the transaction in Euros was divided by the amount charged in U.S. Dollars.

47.     The FX rate that Visa imposed on Ms. Wright's transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on the date her transaction was processed:

-11-

| Processing Date | Highest Rate Available in Wholesale Currency Markets for Processing Date | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|
| ███████████████ | ███████████████ | ███████████████ |

48.     Had Ms. Wright's transaction been processed at the highest rate available in wholesale currency markets on the date her transaction was processed, she would have been charged ████. By applying a FX rate higher than the highest rate available in wholesale currency markets on the date her transaction was processed, Visa overcharged Ms. Wright ████ for this transaction.[5]

49.     In selecting an above-wholesale-market rate, Visa violated the rate-selection procedures laid forth in the Visa Rules, as well as Ms. Wright's reasonable expectations that Visa would act in good faith in imposing exchange rates actually found in the wholesale market. Visa maximized its profits at Ms. Wright's expense.

50.     Visa's conduct caused Ms. Wright to pay more for the transaction than she would have paid had Visa selected a rate that was actually present in the wholesale market.

51.     Ms. Wright relied on her billing statement from Capital One, which set forth an inflated amount, and paid the amount due. Had she known the whole truth, she would not have paid the amount charged on the billing statement. Ms. Wright's precise damages for any other transactions where she was overcharged will be calculable once Plaintiffs obtain discovery from Visa.

### iii.     Plaintiff Brittany Delacruz

52.     Plaintiff Brittany Delacruz is an individual and a resident of New Jersey who, during the relevant period, was living abroad in Spain. During the relevant period, Ms.

---

[5] ███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

Delacruz was the holder of a Capital One-issued, Visa-branded credit card and engaged in more than 700 foreign transactions using the card between May 2019 and July 2021.

53.     Pursuant to the Visa Rules and Capital One's agreements with Ms. Delacruz, Visa agreed that in selecting a FX rate for each such transaction, it would select a rate "from the range of rates available in wholesale currency markets for the applicable Processing Date" for the transaction. *See infra* ¶ 135. However, for at least one such transaction—and likely more given the pervasive nature of Visa's scheme (*see infra* ¶ 149)—Visa instead selected a FX rate that was higher than the highest wholesale market rate for the transaction's processing date.

54.     For example, Ms. Delacruz's Capital One, Visa-branded credit card statement shows that on February 13, 2021, Ms. Delacruz was charged $158.22 for a transaction for 130.35 Euros. The statement shows a FX rate of 0.823852863. No other date is reflected on the statement related to the transaction.

55.     ████████████████████████████████████████████
████████████████████

56.     ████████████████████████████████████
████████████████████████████████████████

████████████ This appears to be the same exchange rate that was posted on Visa's website (after the fact, and with fewer decimals on the website version) for transactions processed on February 14, 2021.

57.     The inverse of the rate used by Visa is ████████, which is **not** the rate reflected on Ms. Delacruz's Capital One's statement (0.823852863). While the rate printed on the statement is very close to the exchange rate used, discovery will show that the exchange rates on Capital One's statements are simply the result of a mathematical calculation whereby the amount of the transaction in Euros was divided by the amount charged in U.S. Dollars.

58.     The FX rate that Visa imposed on Ms. Delacruz's transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and

-13-

Reuters (Refinitiv) data, on both (1) the processing date and (2) the day before the processing date:

| Processing Date | Processing Date and Day Prior | Highest Rate Available in Wholesale Currency Markets for Processing Date and Day Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
|  |  |  |  |

59.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on either the date her transaction was processed or the date prior to the date her transaction was processed, she would have been charged ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ .

60.     As a second example, Ms. Delacruz's Capital One, Visa-branded credit card statement shows that on June 13, 2019, Ms. Delacruz was charged $289.72 for a transaction for 256.28 Euros. The statement shows a FX rate of 0.884578213. No other date is reflected on the statement related to the transaction.

61.     Discovery will show that this transaction was processed on June 14, 2019.[6] Discovery will also show that the exchange rate Visa applied to this transaction was 1.130487.

---

[6] For this and the following two exemplar transactions, the processing date can be determined based on the foreign transaction amount, the domestic currency amount, and the FX conversion rates published on Visa's website. Due to fluctuations in Visa's rates, it is possible to rule out other potential processing dates because the rates Visa used on those dates would have yielded different charge amounts to Ms. Delacruz. This same analysis is not possible for all transactions, as a processing date can only be inferred in circumstances where there is sufficient daily variation in Visa's applied rates (and a sufficient transaction amount) for alternate potential daily rates to be excluded. Here, Plaintiffs' Counsel analyzed potential processing dates for seven days following the transaction date. For each exemplar transaction, the processing date identified as the date that will be revealed in discovery is

-14-

62.     The inverse of the rate used by Visa is 0.8845745241, which is, again, **not** the rate reflected on Ms. Delacruz's Capital One statement (0.884578213).

63.     The FX rate that Visa imposed on Ms. Delacruz's June 13, 2019 transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on both the (1) processing date and (2) the day before the processing date:

| Processing Date | Processing Date and Day Prior | Highest Rate Available in Wholesale Currency Markets for Processing Date and Day Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| June 14, 2019 | June 14, 2019 | 1.1289 | 1.130487 |
|  | June 13, 2019 | 1.1304 |  |

64.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on the date her transaction was processed, she would have been charged $289.31. By applying a FX rate higher than the highest rate available in wholesale currency markets on the date her transaction was processed, Visa overcharged Ms. Delacruz $0.41 for this transaction.[7]

65.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on the date prior to the date on which her transaction was processed, she would have been charged $289.70. By applying a FX rate higher than the

---

the only date where using Visa's published exchange rate would yield the amount of the charge in U.S. Dollars that appeared on Ms. Delacruz's statements.

[7] Neither Capital One's account agreements nor the Visa Rules state that Visa may use wholesale market rates from the day prior to the processing date. Plaintiff Delacruz reserves the right to contest Visa's use of wholesale market rates from the day prior to the date on which her transaction was processed, as she never agreed to that procedure, and it is not set forth in the Visa Rules. The only apparent purpose behind Visa using the prior day's rates in some instances is to enable Visa to maximize its profits at the expense of consumers.

-15-

highest rate available in wholesale currency markets on the date prior to the date on which her transaction was processed, Visa overcharged Ms. Delacruz $0.02 for this transaction.

66.     As a third example, Ms. Delacruz's Capital One, Visa-branded credit card statement shows that on May 7, 2019 Ms. Delacruz was charged $70.54 for a transaction for 62.85 Euros. The statement shows a FX rate of 0.890983839. No other date is reflected on the statement related to the transaction.

67.     Discovery will show that this transaction was processed on May 8, 2019. Discovery will also show that the exchange rate Visa applied to this transaction was 1.122288.

68.     The inverse of the rate used by Visa is 0.8910368818, which is, again, **not** the rate reflected on Ms. Delacruz's Capital One's statement (0.890983839).

69.     The FX rate that Visa imposed on Ms. Delacruz's May 7, 2019 transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on both the (1) processing date and (2) the day before the processing date:

| Processing Date | Processing Date and Day Prior | Highest Rate Available in Wholesale Currency Markets for Processing Date and Day Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| May 8, 2019 | May 8, 2019 | 1.1214 | 1.122288 |
| | May 7, 2019 | 1.1221 | |

70.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on the date her transaction was processed, she would have been charged $70.48. By applying a FX rate higher than the highest rate available in wholesale currency markets on the date her transaction was processed, Visa overcharged Ms. Delacruz $0.06 for this transaction.

71.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on the date prior to the date on which her transaction was processed, she would have been charged $70.52. By applying a FX rate higher than the highest rate available in wholesale currency markets on the date prior to the date her transaction as processed, Visa overcharged Ms. Delacruz $0.02 for this transaction

72.     As a fourth example, Ms. Delacruz's Capital One, Visa-branded credit card statement shows that on November 22, 2020, Ms. Delacruz was charged $24.66 for a transaction for 20.71 Euros. The statement shows a FX rate of 0.839821573. No other date is reflected on the statement related to the transaction.

73.     Discovery will show that this transaction was processed on November 24, 2020. Discovery will also show that the exchange rate Visa applied to this transaction was 1.190799.

74.     The inverse of the rate used by Visa is 0.8397722873, which is, again, **not** the rate reflected on Ms. Delacruz's Capital One's statement (0.839821573).

75.     The FX rate that Visa imposed on Ms. Delacruz's November 22, 2020 transaction was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on the date her transaction was processed:

| Processing Date | Highest Rate Available in Wholesale Currency Markets for Processing Date | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|
| November 24, 2020 | 1.1865 | 1.190799 |

76.     Had Ms. Delacruz's transaction been processed at the highest rate available in wholesale currency markets on the date her transaction was processed, she would have been charged $24.57.  By applying a FX rate higher than the highest rate available in

-17-

wholesale currency markets on the date her transaction was processed, Visa overcharged Ms. Delacruz $0.09 for this transaction.[8]

77.    In selecting above-wholesale-market FX rates, Visa violated the rate-selection procedures laid forth in the Visa Rules and Ms. Delacruz's reasonable expectations that Visa would act in good faith in imposing exchange rates actually found in the wholesale market. Visa maximized its profits at Ms. Delacruz's expense.

78.    Visa's conduct caused Ms. Delacruz to pay more for her transactions than she would have paid had Visa selected rates that were actually present in the wholesale market.

79.    Ms. Delacruz relied on her billing statements from Capital One, which set forth these inflated amounts, and paid the amounts due. Had she known the whole truth, she would not have paid the amounts charged on the billing statements. Ms. Delacruz's precise damages, for any other transactions where she was overcharged will be calculable once Plaintiffs obtain discovery from Visa.

### iv.    Plaintiff Maureen Young

80.    Plaintiff Maureen Young is an individual and a resident of Maineville, Ohio. During the relevant period, Ms. Young was the holder of a Bank of America-issued, Visa-branded credit card and engaged in at least eight foreign transactions using the card between October 2018 and June 2019.

81.    Pursuant to the Visa Rules and Bank of America's agreements with Ms. Young, Visa agreed that in selecting a FX rate for each such transaction, it would select a rate "from the range of rates available in wholesale currency markets for the applicable Processing Date" for the transaction. *See infra* ¶ 135. However, for at least one such transaction—and likely more given the pervasive nature of Visa's scheme (*see infra* ¶ 149)-

---

[8] Neither Capital One's account agreements nor the Visa Rules state that Visa may use wholesale market rates from the day prior to the processing date. Plaintiff Delacruz reserves the right to contest Visa's use of wholesale market rates from the day prior to the date on which her transaction was processed, as she never agreed to that procedure, and it is not set forth in the Visa Rules. The only apparent purpose behind Visa using the prior day's rates in some instances is to enable Visa to maximize its profits at the expense of consumers.

1  -Visa instead selected a FX rate that was higher than the highest wholesale market rates for

2  the transaction's processing date.

3        82.    For example, Ms. Young's Bank of America, Visa-branded credit card

4  statement shows that for a transaction dated May 15, 2019, she was charged $1,027.51 for

5  a transaction for 795.00 British Pound Sterling ("GBP"). The statement does not show a FX

6  rate for the transaction, which was posted to Ms. Young's account on May 16, 2019. Nor

7  does the statement show the date on which the transaction was processed.

8        83.    ████████████████████████████████████████████████████

9  █████████████████████████

10       84.    ████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████

12  █████████. This appears to be the same exchange rate that was posted on Visa's website

13  (after the fact, and with fewer decimals on the website version) for transactions processed

14  on May 16, 2019.

15       85.    The FX rate that Visa imposed on Ms. Young's transaction was *above* the

16  highest rate available in wholesale currency markets, referencing both Bloomberg data and

17  Reuters (Refinitiv) data, on both (1) the processing date and (2) the day before the

18  processing date:

| Processing Date | Processing Date and Day Prior | Highest Rate Available in Wholesale Currency Markets for Processing Date and Day Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| ██████ | ██████ | ██████ | ██████ |

26       86.    Had Ms. Young's transaction been processed at the highest rate available in

27  wholesale currency markets on the date her transaction was processed, she would have been

28  charged ███████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████████████████████

2  ██████████████████████████.

3       87.    Had Ms. Young's transaction been processed at the highest rate available in

4  wholesale currency markets on the day prior to the date her transaction was processed, she

5  would have been charged ████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████

7  ████████████████████████████████████.

8       88.    In selecting an above-wholesale-market rate, Visa violated the rate-selection

9  procedures laid forth in the Visa Rules, as well as Ms. Young's reasonable expectations that

10  Visa would act in good faith in imposing exchange rates actually found in the wholesale

11  market. Visa maximized its profits at Ms. Young's expense.

12       89.    Visa's conduct caused Ms. Young to pay more for the transaction than she

13  would have paid had Visa selected a rate that was actually present in the wholesale markets.

14       90.    Ms. Young relied on her billing statement from Bank of America, which set

15  forth this inflated amount, and paid the amount due. Had she known the whole truth, she

16  would not have paid the amount charged on the billing statement. Ms. Young's precise

17  damages on any other transactions where she was overcharged will be calculable once

18  Plaintiffs obtain discovery from Visa.

19       **v.    Plaintiff Rachelle Blake**

20       91.    Plaintiff Rachelle Blake is an individual and a resident of Orange County,

21  California. During the relevant period, Ms. Blake was the holder of a Bank of America-

22  issued, Visa-branded credit card and engaged in over 45 foreign transactions using the card

23  between March and December 2019.

24       92.    Pursuant to the Visa Rules and Bank of America's agreements with Ms.

25  Blake, Visa agreed that in selecting a FX rate for each such transaction, it would select a

26  rate "from the range of rates available in wholesale currency markets for the applicable

27  Processing Date" for the transaction. *See infra* ¶ 135. However, for at least one such

28  transaction—and likely more given the pervasive nature of Visa's scheme (*see infra* ¶

149)—Visa instead selected a FX rate that was higher than the highest wholesale market rates for the transaction's processing date.

93.     For example, Ms. Blake's Bank of America, Visa-branded credit card statement shows that for a transaction dated July 23, 2019, she was charged $194.31 for a transaction in Euros. The statement does not show a FX rate for the transaction, or the amount in Euros, and which was posted to Ms. Blake's account on July 24, 2019. Nor does the statement show the date on which the transaction was processed.

94.     Discovery will show the exact processing date of this transaction as well as the rate Visa ultimately applied to the transaction, but from July 23, 2019 through July 24, 2019, the Visa website rate was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data, on both (1) the dates on the statement and (2) the day before each date:

| Statement Date | Statement Dates and Days Prior | Highest Rate Available in Wholesale Currency Markets for Statement Dates and Days Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| (Earliest) July 23, 2019 | July 23, 2019 | 1.1210 | 1.122588 |
| | Day Prior July 22 2019 | 1.1225 | |
| (Latest) July 24, 2019 | July 24, 2019 | 1.1158 | 1.121188 |
| | Day Prior July 23 2019 | 1.1210 | |

95.     By applying a FX rate higher than the highest rate available in wholesale currency markets on the same date as the processing date, Visa overcharged Ms. Blake either $0.27 or $0.93 dependent on the processing date.

96.     By applying a FX rate higher than the highest rate available in wholesale currency markets on the date prior to the processing date, Visa overcharged Ms. Blake either $0.03 or $0.02 dependent on the processing date.

97.     As another example, Ms. Blake's Bank of America, Visa-branded credit card statement shows that for a transaction dated August 16, 2019, she was charged $34.93 for a transaction in Euros. The statement does not show a FX rate for the transaction, or the amount in Euros, and which was posted to Ms. Blake's account on August 19, 2019. Nor does the statement show the date on which the transaction was processed.

98.     Discovery will show the exact processing date of this transaction as well as the rate Visa ultimately applied to Ms. Blake's transaction, but from August 16, 2019 through August 19, 2019, the Visa website rate was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data on both (1) the dates on the statement and (2) the day before each date:

| Statement Date | Statement Dates and Days Prior | Highest Rate Available in Wholesale Currency Markets for Statement Dates and Days Prior | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| (Earliest) August 16, 2019 | August 16, 2019 (Friday) | 1.1113 | 1.115988 |
| | Day Prior August 15, 2019 | 1.1158 | |
| August 17, 2019 | August 17, 2019 (Saturday[9]) | 1.1113 | 1.111789 |
| | Day Prior August 16, 2019 | 1.1113 | |
| August 18, 2019 | August 18, 2019 (Sunday) | 1.1113 | 1.111789 |
| | Day Prior August 17, 2019 (Saturday) | 1.1113 | |
| (Latest) August 19, 2019 | August 19, 2019 (Monday) | 1.1114 | 1.111789 |
| | Day Prior August 17, 2019 (Sunday) | 1.1113 | |

[9] The wholesale market rates for Saturday, August 17, 2019 and Sunday, August 18, 2019, are equal to the wholesale market rates on Friday, August 16, 2019.

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

99.     By applying a FX rate higher than the highest rate available in wholesale currency markets on the same date as the processing date, Visa overcharged Ms. Blake between $0.01 and $0.15 on this transaction dependent on the processing date.

100.     By applying a FX rate higher than the highest rate available in wholesale currency markets on the date prior to the processing date, Visa overcharged Ms. Blake either $0.01 or $0.02 on this transaction.

101.     As a third example, Ms. Blake's Bank of America, Visa-branded credit card statement shows that for a transaction dated August 19, 2019, she was charged $699.80 for a transaction in Euros. The statement does not show a FX rate for the transaction, or the amount in Euros, and which was posted to Ms. Blake's account on August 21, 2019. Nor does the statement show the date on which the transaction was processed.

102.     Discovery will show the exact processing date of this transaction as well as the rate Visa ultimately applied to Ms. Blake's transaction, but from August 19, 2019 through August 21, 2019, the Visa website rate was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data on both (1) the dates on the statement and (2) the day before each date:

| Potential Processing Date | Statement Dates and Days Prior | Highest Rate Available in Wholesale Currency Markets | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| August 19, 2019 | August 19, 2019 | 1.1114 | 1.111789 |
| | Day Prior August 18, 2019 (Sunday) | 1.1113 | |
| August 20, 2019 | August 20, 2019 | 1.1107 | 1.111489 |
| | Day Prior August 19, 2019 | 1.1114 | |
| August 21, 2019 | August 21, 2019 | 1.1107 | 1.110789 |
| | Day Prior August 20, 2019 | 1.1107 | |

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

103.    By applying a FX rate higher than the highest rate available in wholesale currency markets on the same date as the processing date, Visa overcharged Ms. Blake between $0.06 and $0.50 on this transaction dependent on the processing date.

104.    By applying a FX rate higher than the highest rate available in wholesale currency markets on the date prior to the processing date, Visa overcharged Ms. Blake between $0.06 and $0.31 on this transaction dependent on the processing date.

105.    As a fourth example, Ms. Blake's Bank of America, Visa-branded credit card statement shows that for a transaction dated August 20, 2019, she was charged $1,168.38 for a transaction in Euros. The statement does not show a FX rate for the transaction, or the amount in Euros, which was posted to Ms. Blake's account on August 21, 2019. Nor does the statement show the date on which the transaction was processed.

106.    Discovery will show the exact processing date of this transaction as well as the rate Visa ultimately applied to Ms. Blake's transaction, but from August 20, 2019 through August 21, 2019, the Visa website rate was *above* the highest rate available in wholesale currency markets, referencing both Bloomberg data and Reuters (Refinitiv) data on both (1) the dates on the statement and (2) the day before each date:

| Potential Processing Date | Statement Dates and Days Prior | Highest Rate Available in Wholesale Currency Markets | Visa Exchange Rate Applied to Transaction, Per Visa Website |
|---|---|---|---|
| August 20, 2019 | August 20, 2019 | 1.1107 | 1.111489 |
| | Day Prior August 19, 2019 | 1.1114 | |
| August 21, 2019 | August 21, 2019 | 1.1107 | 1.110789 |
| | Day Prior August 20, 2019 | 1.1107 | |

107.    By applying a FX rate higher than the highest rate available in wholesale currency markets on the same date as the processing date, Visa overcharged Ms. Blake either $0.83 or $0.09 on this transaction, dependent on the processing date.

108.    By applying a FX rate higher than the highest rate available in wholesale currency markets on the date prior to the processing date, Visa overcharged Ms. Blake $0.09 on this transaction.

109.    In selecting above-wholesale-market rates, Visa violated the rate-selection procedures laid forth in the Visa Rules, as well as Ms. Blake's reasonable expectations that Visa would act in good faith in imposing exchange rates actually found in the wholesale market. Visa maximized its profits at Ms. Blake's expense.

110.    Visa's conduct caused Ms. Blake to pay more for the transactions than she would have paid had Visa selected rates that were actually present in the wholesale markets.

111.    Ms. Blake relied on her billing statements from Bank of America, which set forth these inflated amounts, and paid the amounts due. Had she known the whole truth, she would not have paid the amounts charged on the billing statements. Ms. Blake's precise damages on any other transactions where she was overcharged will be calculable once Plaintiffs obtain discovery from Visa.

## FACTUAL ALLEGATIONS

### A.    Overview of the Payment Card Foreign Exchange Market

112.    When a U.S. consumer makes a payment card transaction in U.S. Dollars with a U.S. merchant, the merchant runs the physical card (or card information, for an online or phone order) through its payment card terminal, the card information is submitted to Visa's electronic payment system, and the system sends information about the transaction to the cardholder's issuing bank to make sure the cardholder has enough money or credit available to complete the purchase, and to confirm that the card is valid and not lost, stolen, fake or expired. The transaction is then approved or declined. For approved transactions, the merchant's account is credited in U.S. Dollars (minus an "interchange fee" paid by the merchant to the bank that issued the consumer's card) and the consumer's account is debited for the full amount of the transaction in U.S. Dollars. Visa sets default interchange fees on payment card transactions that merchants are required to pay to the issuing banks.

113.    When a U.S. consumer makes a payment card transaction in a foreign currency with an overseas merchant, the consumer's payment card account is debited for the transaction in U.S. Dollars, and the merchant is credited for the transaction in either its home currency or some other agreed-upon currency, such as U.S. Dollars (minus the interchange fee). Regardless of the currency in which the transaction is actually settled, Visa performs a calculation whereby the amount the consumer pays is determined as if the transaction had been settled in a foreign currency. The exchange rate used for this purpose is initially determined by Visa.

114.    During the relevant period, the exchange rate used by Visa to convert foreign currencies is applied on the "processing date" of each foreign payment card transaction. The processing date for a payment card transaction is the date on which the issuing bank submits the transaction information to Visa and Visa accepts that information.

115.    For many payment card foreign transactions, the issuing bank charges a "foreign exchange fee," calculated as a percentage of the total transaction amount. Issuing banks generally charge foreign transaction fees ranging from 0% (*i.e.*, no foreign transaction fee) to 3%.

116.    Cardholder Agreements between payment cardholders and issuing banks generally provide that conversion rates for foreign transactions will be determined by Visa pursuant to Visa's operating procedures, which are sometimes described in those agreements. Visa's operating procedures for currency conversions are set forth in the Visa Rules.

117.    The largest participants in the wholesale FX market are dealer banks such as JPMorgan, Deutsche Bank, Citigroup, Barclays, UBS, and HSBC. Dealer banks trade foreign currency with each other and with other large financial institutions including Visa. Wholesale FX market rates are streamed to dealer banks in real time on major multi-bank FX trading platforms including Reuters and Bloomberg. Wholesale FX market participants use these platforms to make offers to purchase foreign currencies and analyze historical wholesale FX market prices.

-26-

118.   Visa also engages in foreign currency transactions with dealer banks. Visa engages in such transactions to mitigate the risk associated with foreign currency exchange rate fluctuations, and to obtain currencies necessary to cover cardholders' foreign currency payment card transactions.

119.   However, Visa does not engage in parallel foreign currency transactions on the wholesale FX market for individual payment cardholder transactions, either on a per-transaction basis, or even on a daily basis.

120.   Instead, Visa maintains derivative contracts and reserves of currency and move funds between reserves as needed.[10]

121.   As one court found, Visa also incurs "minimal currency conversion costs." *Schwartz v. Visa Int'l Corp.*, No. 822404-4, 2003 WL 1870370, at *28 (Cal. Super. Ct. Apr. 7, 2003).

122.   Because Visa generally settles foreign transactions in both directions for a given currency pair (*e.g.*, Visa has U.S. cardholders making purchases both in Europe and European cardholders making purchases in the U.S.), Visa is only required to "settle" the net amount of each given currency for each day. In other words, if Visa processed $1 billion in transactions from Euros to U.S. Dollars and the same amount from U.S. Dollars to Euros on a particular day, Visa would not need to engage in any actual FX transactions in the wholesale market on that day.

123.   Moreover, in many instances where U.S. consumers are quoted a price in a foreign currency (*i.e.*, Euros), Visa settles the transactions with the foreign merchant using U.S. Dollars. In these instances, no foreign currency whatsoever is required. The U.S. consumer's account is debited in U.S. Dollars, and the merchant is paid in U.S. Dollars.

---

[10] "The Company uses foreign exchange forward derivative contracts to reduce its exposure to foreign currency rate changes on forecasted non-functional [i.e. non-U.S. dollar] currency denominated operational cash flows." *See* Visa Inc., 2020 Form 10-K, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001403161/0504ac14-a3a0-4506-9352-aa15cd087268.pdf, at 71 (last accessed July 2, 2021).

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

Visa has no foreign exchange risk for these transactions. The idea that the consumer purchases in a foreign currency in such a transaction is a pure fiction.

124. For all these reasons, the rates that Visa imposes on payment cardholders are not representative of the rates Visa actually pays for foreign currency. Nor are they reflective of any other risks or costs associated with currency conversion that Visa bears. Instead, Visa and the banks are engaged in arbitrage: together, they select and charge payment cardholders foreign exchange "rates" worse than those available on a given day in the wholesale market—even when no exchange of foreign currency actually occurs. And, they do so without regard to the terms of the member banks' Cardholder Agreements with payment cardholders or the terms of the Visa Rules. Visa's conduct is not in good faith, is unfair, unlawful, unjust, fraudulent, immoral, unethical, oppressive, unscrupulous, or substantially injurious, causing harm to consumers that outweighs any purported benefit or utility.

**B.    The Visa Rules and Cardholder Agreements**

125. The contractual obligations between member banks and their payment cardholders, including Plaintiffs and members of the proposed Classes, are set forth in each bank's Cardholder Agreements. The Cardholder Agreement is provided to credit card and debit card applicants who must accept the terms prior to the issuance of each payment card.

126. Visa's relationships with the issuing banks are also governed by written agreements. These terms are memorialized in the Visa Rules. Banks that issue Visa payment cards to their cardholders are referred to in the Visa Rules as the "Issuers."

**a.   Visa Rules**

127. The Visa Rules expressly require issuing banks to include specific language in the member banks' Cardholder Agreements explaining how FX rates are determined for Visa payment card transactions. *See* Visa Rules at 85–86 (International Transaction or Currency Conversion Fee Disclosure).

128. Specifically, the Visa Rules require member banks to state in their Cardholder Agreements that the FX rate imposed on each payment cardholder's foreign

-28-

transaction will be either (1) a wholesale FX market rate, or (2) a government-mandated rate.

129.    The Visa Rules require issuing banks to make specific disclosures to payment cardholders about how FX rates will be determined.

130.    In relevant part and as in effect during the relevant period until April 17, 2021, Section 1.4.3.2 of the Visa Rules provides that:

> An Issuer must provide a complete written disclosure of any fees that may be charged to a Cardholder for an International Transaction or when Currency Conversion occurs and must include the exchange rate between the Transaction Currency and the Billing Currency as either of the following:
>
> - A rate selected by Visa from the range of rates available in wholesale currency markets for the applicable Processing Date, which rate may vary from the rate Visa receives[; or]
> - The rate mandated by a government or governing body in effect for the applicable Processing Date[.]
>
> When Currency Conversion occurs, the Visa rate may be adjusted by the application of an Optional Issuer Fee as determined by the Issuer or via any Issuer self-determined markup outside of VisaNet.
>
> An Issuer may choose the method by which it notifies the Cardholder. This may include one or more of the following, which may include electronic forms of communication:
>
> - Original Cardholder application agreement
> - Terms and conditions
> - Billing statement
> - Any other agreement between the Cardholder and the Issuer[.]

131.    The Visa Rules were subsequently amended on April 17, 2021 and again on October 16, 2021. The only change to Section 1.4.3.2 of the Visa Rules is that, effective April 17, 2021, Visa requires issuing banks to disclose that Visa will select (1) a rate from the range of rates available in wholesale currency markets or (2) the rate mandated by a government or governing body in effect "for the applicable *Transaction*," and no longer for the "applicable *Processing Date*."

132.    Regardless of whether Visa applies FX rates for the applicable processing date (for transactions prior to April 16, 2021) or the transaction (for transactions after April 16, 2021), the Visa Rules require that the selected FX rates be either wholesale rates or government mandated rates.

**b.  Cardholder Agreements**

133.    Visa's practices for selecting exchange rates do not vary based on the issuing bank of the payment card. In other words, Visa applies the same procedures regardless of whether the consumer has a Capital One payment card, a Bank of America payment card, or a payment card from some other issuing bank.

134.    Capital One maintains a uniform Credit Card Agreement for each Capital One issued credit card product. The terms and conditions set forth in these Cardholder Agreements—including the provisions regarding foreign currency exchange rates—are substantially similar across all of Capital One's Cardholder Agreements. For example, the Credit Card Agreement for the Capital One Visa Signature Card is substantially the same as the Credit Card Agreement for the Capital One VentureOne Rewards Mastercard.

135.    At all times relevant to this Complaint, all of Capital One's Cardholder Agreements contained substantially similar foreign currency language. Specifically, for Visa-branded payment credit cards issued by Capital One, Capital One's Cardholder Agreements required the FX rates imposed on Capital One's cardholders to be according to the Visa Rules:[11]

> If you make a transaction in a foreign currency, the Payment Card Network will convert it into a U.S. dollar amount. The Payment Card Network will use its own currency conversion procedures. The conversion rate in effect on the processing date may differ from the rate in effect on the transaction date that appears on your Statement.

136.    Similarly, for all Visa-branded payment cards issued by Bank of America during the relevant time period, Bank of America's Credit Card Agreements required the

---

[11]    https://ecm.capitalone.com/WCM/card/credit-card-agreement-for-consumer-cards-in-capital-one-bank-usa-na.pdf.

FX rates imposed on Bank of America's payment cardholders to be imposed per the Visa Rules, *i.e.*, either (1) a wholesale FX market rate, or (2) a government-mandated rate.

137.    For example, Bank of America's December 31, 2016 Visa consumer contracts provided:

> If you make a transaction in a foreign currency (including, for example, online purchases from foreign merchants), the transaction will be converted by Visa International or MasterCard International, depending on which card is associated with this account, into a U.S. dollar amount in accordance with the operating regulations or conversion procedures in effect at the time the transaction is processed. *Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.*

(emphasis added).

138.    Bank of America's Visa Signature Credit Card Agreements contained this this same language as well, stating:

> Currently, those regulations and procedures provide that the currency conversion rate to be used is either (1) a wholesale market rate or (2) a government-mandated rate in effect one day prior to the processing date. The currency conversion rate in effect on the processing date may differ from the rate in effect on the transaction date or posting date.

139.    Bank of America also issues agreements for Visa-branded debit cards which include similar provisions.[12] For example, a 2015 Bank of America "Important Information Brochure: Card Agreement Disclosure" provided that:

---

[12] In their motion to dismiss Plaintiffs' original Complaint, Defendants argued that "Bank of America's deposit account agreement…governs the transactions of four of the named plaintiffs." (*See* ECF No. 35 at 15.) They also claim that the four Plaintiffs with Visa-branded, Bank of America debit cards—Plaintiffs Guerrero (no longer on the operative complaint), Blake, Harris (since dismissed), and McDonald (no longer on the operative complaint)—admitted as much because *other* Plaintiffs, in complaints against *other* banks, "acknowledge[d that]…'Deposit Account Agreements' are the contracts entered into between Issuing Banks and debit cardholders that govern the terms of foreign exchange conversion." (*Id.* at 15, n.23.) Defendants are wrong, and the Bank of America agreement they cite is not the applicable agreement. In fact, the very deposit account agreement that Defendants allege governs the transactions of Plaintiffs with Visa-branded, Bank of America debit cards *explicitly states that such transactions are governed by a separate*

> If you use your debit card to purchase goods or services in a foreign currency
> or in U.S. dollars with a foreign merchant (a "Foreign Transaction"), we will
> assess an International Transaction Fee…If the Foreign Transaction is made
> in a foreign currency, Visa® or Mastercard® will convert the transaction
> into a U.S. dollar amount…If you use your Card to obtain foreign currency
> from an ATM, Visa® or Mastercard® will convert the transaction into a U.S.
> dollar amount…The currency conversion rate used by Visa® will be either
> (1) a rate selected by Visa® from a range of rates available in wholesale
> currency markets for the applicable central processing date, which rate may
> differ from the rate Visa® receives, or (2) a government mandated rate in
> effect for the applicable central process date.

*Alfaro v. Bank of Am., N.A.*, No. 19-22762-CIV, ECF No. 16-2 (S.D. Fla.).

140.     In addition, Bank of America's website currently confirms that, for foreign ATM withdrawals and international purchases made with a Bank of America credit or debit card: "The exchange rate for international purchases and foreign ATM transactions is set by Visa® or MasterCard®, depending on your card's logo. This exchange rate is either the wholesale market rate or a government-mandated rate on the day before the date the transaction is processed."[13]

141.     Across their Cardholder Agreements, Bank of America, Capital One, and other issuing banks fail to disclose that:

- Visa often never "receives" any "rate" because Visa is not exchanging any currency on the wholesale markets and/or is settling transactions in the consumer's home currency;

- The FX rates will be "selected" by Visa for Visa's and the banks' sole benefit;

---

*agreement*. *See* Bank of America Deposit Agreement and Disclosures available at https://www.bankofamerica.com/salesservices/deposits/resources/deposit-agreements/?request_locale=en_US) ("We may issue you an ATM or debit card (either is called a 'card') and a personal identification number (PIN) when you open your account. The terms that govern this service are in a separate agreement that you receive with your card."). Additionally, Plaintiffs Blake and McDonald (no longer named) are in no way bound by the fact that *other* Plaintiffs alleged in *other* litigation that *their* Cardholder Agreements with *their* banks govern *their* debit card transactions.

[13]     *See* Bank of America, *Foreign Exchange Rate FAQs*, *available at* https://www.bankofamerica.com/foreign-exchange/foreign-exchange-rates-faq/     (last accessed Nov. 19, 2021).

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR

- FX rates will not be selected from bid-ask spreads available contemporaneously on the wholesale market, but that "rates" will instead be selected from different points in time depending on the direction of the currency exchange, resulting in spreads that are far larger than those found in the wholesale markets.

- ████████████████████████████████████████████
  ████████████████████

### C.   Rather Than Impose Wholesale Rates, Visa Selected Fictitious, Inflated, Unfair FX "Rates"

142.   Contrary to the Visa Rules and the Cardholder Agreements, the FX rates which Visa imposed on class members on foreign currency transactions during the relevant period were not "wholesale market" rates. Instead, Visa selected rates that were—for many currencies and dates—entirely outside of the range of wholesale market rates, meaning the rates Visa imposed on consumers were worse than those paid by any market participants.

143.   A detailed analysis of Visa's historical exchange rates as posted on its website for the relevant period demonstrates that, on a majority of days and for compared currencies, Visa imposed exchange rates that fell outside of the daily range of wholesale currency market rates on the applicable processing date.[14]

144.   For example, a comparison of the exchange rates applied by Visa to convert payment cardholder transactions from Euros to U.S. Dollars demonstrates that the rate imposed on consumers was higher than the range of rates available in the wholesale FX market for the applicable date on 94 percent of compared dates during the period of September 2018 to August 2019. Visa's rates were within the range of rates available in the wholesale FX market on just 6 percent of those dates.

145.   Discovery will show that Visa's method for determining its rates is largely algorithmic, and that Visa has a pattern of generating profits for itself by selecting "rates"

---

[14] *See* Visa Currency Exchange Calculator, *available at* https://usa.visa.com/support/consumer/travel-support/exchange-rate-calculator.html (*last accessed* Sept. 16, 2022).

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR



1    that are not wholesale market rates, and that are not reasonably related to its actual risk or

2    costs of exchanging foreign currencies. This algorithmic practice persisted throughout the

3    relevant period, across currency pairs. Each such instance of Visa imposing "rates" higher

4    than the wholesale rates injured Plaintiffs and class members and imposed an overcharge.

5    146.

6

7

8

9

10   147.

11

12   148.

13

14

15

16   149.

17

18

19

20   150.

21

22

23   151.

24

25

26

27

28

152.     The extent of the overcharge for each Plaintiff and class member payment card transaction can be calculated using transactional data in the possession, custody, or control of Visa and the member banks; historical Visa rates; and historical wholesale FX market data from third-party providers including Bloomberg and Reuters.

153.     Further, even on the days when Visa imposed a conversion "rate" that was not greater than that paid by a participant in the wholesale market on the applicable date, Visa imposed a rate that was completely divorced from the bid-ask spread for the corresponding rate charged to consumers who were converting the same foreign currency into U.S. Dollars on the same processing date. Thus, Visa cannot be fairly said to have imposed a wholesale "rate" on those consumers at all because in the FX markets, rates are quoted with a bid and an ask, and the spreads are very tight. Visa's practices, on the other hand, resulted in spreads far larger than those ever present in the wholesale markets, rendering the rates fictitious and providing Visa with a non-market-based profit.

154.     While the rates posted on Visa's website can be used to conduct a historical analysis of the relationship between Visa's rates and rates paid by wholesale currency market participants on any given date, it is critical to note that Visa's website does not (and has not ever) provided consumers with either *advance or contemporaneous notice* of the rate that will be used to process transactions that occur on a specific day. Instead, Visa's website provides only historical exchange rates for processing dates. So, a consumer considering making a transaction cannot simply visit Visa's website to learn what exchange rate will be applied to their transaction.

155.     Moreover, in many instances, consumers cannot know when their transaction was processed. So, Visa's website is of limited use because consumers do not know when their transaction was processed and thus cannot determine the rate that was applied to a transaction.

156.     This problem is compounded by the fact that Capital One includes rates that Visa did not actually use on its bank statements. This makes it exceedingly difficult for consumers to know when their transactions were processed by Visa, as they cannot try to

-35-

compare the information available on their statement to figure out the processing date by looking at the Visa website and finding the date on which the rate on the website matches the rate reflected on their statement. While such rates may occasionally, through mathematical happenstance, match the precise rate Visa used, in many instances they will not. Making it further impossible for a consumer to determine the date on which a given transaction was processed is the fact that a consumer would have to know to inverse the rate before performing this exercise.

## CLASS ACTION ALLEGATIONS

157. This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23.

158. Plaintiffs propose that the Court certify multiple classes in this matter.

159. All Plaintiffs assert claims on behalf of the Nationwide Class:

**Nationwide Class:** All persons or entities with a Visa payment card who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

160. Plaintiff Blake asserts claims on behalf of the California Class:

**California Class:** All persons or entities with a Visa payment card residing in California who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

161. Plaintiff Wright asserts claims on behalf of the Washington Class:

**Washington Class:** All persons or entities with a Visa payment card residing in Washington who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives and any Judge and judicial staff assigned to this case.

162. Plaintiff Chakraborty asserts claims on behalf of the Massachusetts Class:

**Massachusetts Class:** All persons or entities with a Visa payment card residing in Massachusetts who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the

1

2

exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives any Judge and judicial staff assigned to this case.

3

163.    Plaintiff Delacruz asserts claims on behalf of the New Jersey Class:

4

5

6

**New Jersey Class:** All persons or entities with a Visa payment card residing in New Jersey who made a transaction in a foreign currency using such card within the applicable statute of limitations wherein the exchange rate imposed was not a government-mandated rate. Excluded from the Class are Visa's executives any Judge and judicial staff assigned to this case.

7

8

164.    <u>Numerosity</u>: The Classes are so numerous that joinder of all class members is impracticable.

9

10

11

165.    <u>Typicality</u>: Plaintiffs' claims are typical of the class members' claims. Visa imposed FX rates on Plaintiffs in the same manner as other class members and did not vary its FX practices from consumer to consumer or from issuing bank to issuing bank.

12

13

14

166.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes, have no known conflicts with other class members, and have retained counsel experienced in complex class action litigation.

15

16

17

167.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

18

19

a.  Whether Visa selected rates that were above or on the high end of rates available in the wholesale market;

20

b.  Whether Visa was unjustly enriched by its conduct;

21

22

c.  Whether Visa's practices were deceptive, unfair, unconscionable, or otherwise violated the state statutory consumer protection laws;

23

d.  The proper measure of damages.

24

25

26

27

168.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Visa has acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

28

-37-

169.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Visa's conduct described in this Complaint stems from common and uniform policies and practices. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Visa's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

170.   The running of any statute of limitations has been equitably tolled by reason of Visa's fraudulent concealment and/or omissions of critical information regarding the exchanged rates imposed. Through its affirmative misrepresentations and omissions, Visa actively concealed from Plaintiffs and class members that the exchange rates imposed were not a wholesale market rate and/or a rate reasonably related to Visa's actual risk of exchanging foreign currencies. Discovery of Visa's illegal conduct takes extensive data analysis of foreign exchange data, some of which is not available without paying significant costs.

171.   As a result of Visa's actions, Plaintiffs and class members were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been overcharged as a direct and proximate result of Visa's acts and omissions.

**FIRST CLAIM FOR RELIEF**
**Unjust Enrichment/Quasi-Contract**
**(By Plaintiffs on Behalf of the Proposed Nationwide Class and all Statewide Classes)**

172.   Plaintiffs incorporate each allegation above as if fully set forth herein.

-38-

173.   As alleged above, for cardholder transactions, the currency conversion rates imposed by Visa on foreign currency transactions were not selected from either wholesale FX market rates or a government-mandated rate as required by the Visa Rules and the Cardholder Agreements.

174.   Visa's conduct, and its retention of overcharges and inflated processing fees, was unjust and unlawful.

175.   Visa required member banks to state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either a (1) wholesale FX market rate, or (2) government-mandated rate. However, this representation was false. As alleged herein, Visa did not select such rates to be imposed upon payment cardholders' foreign transactions.

176.   Instead, Visa manipulated FX rates to give payment cardholders a rate worse than those available in the wholesale market, regardless of the direction of the transaction, and did so *even when the transaction involved no foreign currency whatsoever.*

177.   Visa's unjust conduct caused Plaintiffs and members of the Classes to pay higher amounts for their transactions than they would have paid in the absence of Visa's unlawful conduct. Visa further profited from: (1) spreads between what consumers were charged and what merchants were paid; (2) inflated processing fees on foreign currency payment card transactions, whose overall value was increased by Visa's unjust selection of higher FX rates; and (3) the difference between the rate it imposed on consumers to engage in the foreign transaction, and the rate (if any) Visa actually paid to acquire the foreign currency used to settle the transaction.

178.   Plaintiffs and members of the Classes have conferred a benefit upon Visa in the form of overcharges on foreign currency payment card transactions. Visa knowingly accepted the amounts of those overcharges, as well as the profits from the spreads between what consumers were charged and what merchants paid; the larger processing fees resulting from payment cardholders' inflated total transaction values; and profits from the difference

between the rate Visa imposed on consumers to engage in each foreign transaction, and the rate (if any) Visa paid to acquire the foreign currency used to settle the transaction.

179.    Visa received a benefit, which it knew of and appreciated, at the expense of Plaintiffs and members of the Classes. Visa's acceptance and retention of this benefit is unjust and inequitable under the circumstances. Given the Visa Rules' requirement that the banks make representations to cardholders that Visa would impose on payment cardholders' foreign transactions either a (1) wholesale market rate or (2) government-mandated rate, the Court should exercise its equitable powers to impose a constructive contract between Visa and consumers containing that term, and should not allow Visa to profit from these misrepresentations.

180.    Visa's application of manipulated, unauthorized currency conversion "rates" divorced from actual rates in the wholesale market—even when Visa converted no currency at all—could not reasonably have been expected by Plaintiffs and members of the Classes.

181.    As a result of this unlawful conduct, Visa has been unjustly enriched at the expense of Plaintiffs and members of the Classes.

182.    Plaintiffs and members of the Classes lack an adequate remedy at law against Visa. Moreover, their ability to recover at law against the issuing banks is hotly disputed, with those banks asserting that their contracts with Plaintiffs and members of the Classes do not govern the issuing banks' conduct at issue here at all.

183.    Capital One has disclaimed any contractual liability to Plaintiffs and members of the Classes, characterizing the relevant provisions of its Cardholder Agreements as non-binding "disclosures," as opposed to applicable contractual terms. *Wright et al. v. Capital One Bank (USA), N.A., and Capital One, N.A.*, 1:21-cv-803-TSE-IDD (E.D. Va.), ECF No. 28 at 2 ("Plaintiffs fail to state a breach of contract claim because Capital One did not promise particular FX rates in its agreements but merely explained that the Networks would set the rates using their own respective processes."); *id.* at 21 ("[T]he Cardholder Agreements include mere disclosures…"). Capital One also maintains that its Cardholder Agreements do not create a legally enforceable obligation regarding FX rates

-40-

on its own part, as Visa (and Mastercard) set the rates. *See id.* at 5 ("[Plaintiffs] have not identified and cannot identify a legal obligation of Capital One to support their breach of contract theories. Nor can they assert either contract or statutory claims against Capital One where they allege no actionable conduct by Capital One, having admitted that the Networks impose the FX rates about which they complain."); *id.* at 12 ("[W]ithout a 'provision that obligates' Capital One [in the Cardholder Agreements], Plaintiffs cannot maintain a breach of contract claim" against Capital One.").

184.    Similarly, Bank of America has argued that its Cardholder Agreements do not create any contractual obligations on its part when it comes to the selection of FX rates. *See Guerrero et al. v. Bank of America, N.A.*, No. 3:21-CV-333-RJC-DSC, ECF No. 26 (W.D.N.C.), ECF 26-1 at 12-13 (claiming that Plaintiffs have not alleged "a legally enforceable obligation owed by B[ank of America] to charge either 'a wholesale market rate' or 'a government-mandated rate' in connection with FX transactions."); *id.* at 13 ("Plaintiffs concede the credit card agreement makes clear that it is Visa—not [Bank of America]—that is responsible for rate setting. Thus, any obligation owed in this context would be Visa's contractual obligation to B[ank of America]—not B[ank of America]'s obligation to Plaintiffs.") (internal citation omitted); *id.* (arguing that the Cardholder Agreements lack "any obligation owed by B[ank of America to payment cardholders] to ensure that the Networks have in fact provided a certain rate or range of rates."). Bank of America has also argued that the litigation against it should be stayed pending final adjudication of this action. *Id.* at 24.

185.    All told, the issuing banks deny that Plaintiffs and class members are entitled to any remedies at law, or even that they *have* relevant and enforceable contracts.

186.    Moreover, even if Plaintiffs do have contractual remedies available against the banks, the measure of damages at law for a contract claim against the banks will focus on harm to Plaintiffs and class members caused by the contractual breach (namely the difference between the value of what was promised and what was provided). For claims of unjust enrichment/quasi-contract, on the other hand, Plaintiffs and members of the Classes

-41-

may seek equitable remedies which are broader than what they lost. In particular, Plaintiffs and class members may be entitled to the full benefit obtained by Visa as a result of its unlawful conduct, namely Visa's profits from (1) the spreads between what consumers were charged and what merchants were paid; (2) higher processing fees from inflated transactions values; and (3) the difference between the rate Visa imposed on consumers to engage in foreign transactions, and the rate (if any) Visa paid to acquire the foreign currency used to settle the transactions. These broader benefits, unjustly obtained by Visa, will not necessarily be the same as the damage Plaintiffs and class members suffered, and may exceed the difference between what Plaintiffs paid and what Plaintiffs would have paid had a wholesale rate been imposed. Equity therefore provides for more and different remedies than those available at law, rendering Plaintiffs' and class members' sole remedy at law inadequate, even if it is viable.

187.   For these reasons, Plaintiffs and members of the Classes lack an adequate remedy at law against Visa and are entitled to equitable restitution.

188.   Plaintiffs and members of the Classes therefore seek full disgorgement and restitution of the amounts Visa knowingly accepted and retained as a result of its unlawful and/or wrongful conduct alleged herein.

## SECOND CLAIM FOR RELIEF
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf of Plaintiff Blake and Proposed California Class)

189.   Plaintiff Blake incorporates each allegation above as if fully set forth herein.

190.   Cal. Bus. & Prof. Code §§ 17200, *et seq.* prohibits any unlawful, unfair, or fraudulent business act or practice.

191.   Plaintiff Blake and the members of the California Class are "persons" within the meaning of Section 17201 of the California Unfair Competition Law.

192.   Visa has engaged in unfair competition within the meaning of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, because Visa's conduct

alleged herein, which occurred in connection with the marketing, advertisement, and sale of its credit card services, is both (1) unfair and (2) fraudulent.

193.    Visa's conduct, as described herein, violated the Unfair Competition Law's "unfair" prong because it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and has caused harm to Plaintiff Blake and members of the proposed California Class, which they could not have reasonably avoided, that outweigh any purported benefit or utility.

194.    Visa benefitted from imposing unauthorized FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were entirely outside the range of wholesale market rates such that Plaintiff Blake and members of the California Class were injured in the form of overcharges on FX payment card transactions.

195.    Visa's conduct is effectively hidden from consumers. While Visa purports to post the FX rates it selects on the Visa website, Visa does not require issuing banks to inform cardholders that the FX rates are available online. Nor does Visa disclose in the Visa Rules that the FX rates it imposes are online. Moreover, cardholders have no reason to believe that Visa is imposing worse FX rates than what it promised and, therefore, even if cardholders knew they could find the Visa FX rates online, they would have no reason to check the rates shown on the Visa website against the wholesale market rates. Moreover, cardholders have no way of knowing, before engaging in a foreign transaction, what rate Visa will apply to the transaction.

196.    Visa's conduct, as described herein, also violated the Unfair Competition Law's "fraudulent" prong because Visa made false and misleading statements to California consumers, omitting material information regarding its FX rate-selection procedure.

-43-

1      197.   Visa's acts and practices are fraudulent. Visa had exclusive knowledge of
2  material information about its FX rate-selection procedures that was not known to Plaintiff
3  Blake and members of the California Class. Visa deceived Plaintiff Blake and the California
4  Class by making partial representations about its FX rate-selection procedures and omitting
5  material facts. Having made representations regarding its FX rate-selection procedures,
6  Visa had a duty to disclose all material facts within its knowledge regarding these
7  procedures.

8      198.   Visa's acts and practices are fraudulent because they induced Plaintiff Blake
9  and members of the California Class to pay the amounts charged on their billing statements
10  for the foreign transactions made with their Visa-branded payment cards. Plaintiff Blake
11  and members of the California Class relied on their billing statements from their issuing
12  banks, which set forth the amounts charged or owed for their transactions.

13      199.   Having no reason to believe that the FX rates selected by Visa and applied
14  to the transactions on their billing statements were anything other than wholesale market
15  rates selected in good faith, Plaintiff Blake and members of the California Class paid the
16  amounts charged on their billing statements. Had Plaintiff Blake and members of the
17  California Class known the whole truth, they would not have paid the amounts charged on
18  the billing statements issued by their issuing banks.

19      200.   Visa's acts and practices are likely to deceive the public.

20      201.   A reasonable consumer would be deceived by Visa's statements and
21  omissions regarding its FX rate-selection procedures, and Plaintiff Blake and members of
22  the California Class have in fact been deceived and would have behaved differently had
23  they known the whole truth.

24      202.   As a direct and proximate cause of Visa's conduct, which constitutes an
25  unfair business practice, as herein alleged, Plaintiff Blake and members of the California
26  Class have been damaged and suffered ascertainable losses. Specifically, Plaintiff Blake
27  and members of the California Class paid more for their foreign transactions than they
28  would have paid had the exchange rates applied to those transactions been selected lawfully.

-44-

203.    The injuries suffered by Plaintiff Blake and members of the California Class are not outweighed by any benefits to consumers or competition. Further, Plaintiff Blake and members of the California Class could not have reasonably avoided such injuries.

204.    Visa's practices of applying overcharges to payment cardholders' foreign currency transactions was continuous throughout at least the relevant period.

205.    Plaintiff Blake and members of the California Class lack an adequate legal remedy against Visa regarding the overcharges Visa obtained.

206.    Not only do Plaintiff Blake and members of the California Class lack a contractual claim against Visa directly, but their banks have alleged that the contracts of Plaintiff Blake and members of the California Class with the banks do not govern the banks' conduct at issue here at all.

207.    Plaintiff Blake and members of the California Class are entitled to recover restitution and equitable relief, refunds of moneys, interest, reasonable attorneys' fees, filing fees, and the costs of prosecuting this class action, as well as any and all other relief that may be available.

### THIRD CLAIM FOR RELIEF
#### Violations of the Washington Consumer Protection Act
#### RCW § 19.86, *et seq*.
#### (On Behalf of Plaintiff Wright and Proposed Washington Class)

208.    Plaintiff Wright incorporates each allegation above as if fully set forth herein.

209.    Visa's conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of RCW § 19.86.202.

210.    Visa has been engaged in trade or commerce throughout the relevant period.

211.    Visa's conduct had the capacity to deceive a substantial portion of the public. Specifically, by issuing Rules requiring member banks to make certain disclosures and by making false statements in the Visa Rules, Visa misrepresented the method by which it would select FX rates for payment cardholders' foreign transactions. Through the Visa Rules, Visa required member banks to state in their Cardholder Agreements that the FX

-45-

rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate. However, Visa did not impose such rates and, instead, selected FX "rates" worse for consumers than those available in the wholesale market. The Visa Rules and Cardholder Agreements did not disclose that Visa would, in fact, impose rates higher than wholesale market rates. Visa's representations, omissions, and practices were likely to mislead a reasonable consumer into believing that Visa would impose FX rates that were wholesale market rates, when Visa instead selected higher rates—not authorized by the Visa Rules or Cardholder Agreements, nor reasonably related to Visa's costs or risk associated with exchanging foreign currencies—for the sole purpose of maximizing Visa's profits.

212.    Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were entirely outside the range of wholesale market rates. In other circumstances, the rates imposed were at the extreme ends of the artificially divorced "bid" and "ask" of the daily ranges for specific currency pairs, yielding spreads much larger than those found in the wholesale FX markets.

213.    Visa's conduct is effectively hidden from consumers. While Visa purports to post the FX rates it selects on the Visa website, Visa does not require issuing banks to inform cardholders that the FX rates are available online. Nor does Visa disclose in the Visa Rules that the FX rates it imposes are online. Moreover, cardholders have no reason to believe that Visa is imposing worse FX rates than what it promised and, therefore, even if cardholders knew they could find the Visa FX rates online, they would have no reason to check the rates shown on the Visa website against the wholesale market rates. Moreover, cardholders have no way of knowing, before engaging in a foreign transaction, what rate Visa will apply to the transaction.

214.    Plaintiff Wright and members of the Washington Class were injured in the form of overcharges on FX payment card transactions.

215.    Plaintiff Wright and the Washington Class relied on their billing statements from their issuing banks, which set forth the amounts charged or owed for their transactions. Having no reason to believe that the FX rates selected by Visa and applied to the transactions on their billing statements were anything other than wholesale market rates selected in good faith, Plaintiff Wright and members of the Washington Class paid the amounts charged on their billing statements.

216.    As a direct and proximate result of Visa's unlawful conduct, Plaintiff Wright and members of the Washington Class have been injured in their business and property in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct. Had Visa applied the FX rates that had been represented—*i.e.*, wholesale market rates—Plaintiff Wright and members of the Washington Class would have paid less for their foreign transactions.

217.    Visa's practices of applying overcharges to payment cardholders' foreign currency transactions was continuous throughout at least the relevant period.

218.    As a result of Visa's violations of the Washington Consumer Protection Act, Plaintiff Wright and the Washington Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**Violations of the Massachusetts Consumer Protection Act**
**Mass. Gen. Laws Ann. ch. 93A,** *et seq.*
**(On Behalf of Plaintiff Chakraborty and Proposed Massachusetts Class)**

219.    Plaintiff Chakraborty incorporates each allegation above as if fully set forth herein.

220.    Visa's conduct alleged herein constitutes "unfair or deceptive acts or practices" in violation of Mass. Gen. Laws Ann. ch. 93A, §2.

221.   Visa has been engaged in trade or commerce as defined by Chapter 93A throughout the relevant period.

222.   Visa's conduct was unfair or deceptive.

223.   Visa's conduct was deceptive because it had the capacity to mislead consumers, acting reasonably under the circumstances. Specifically, Visa misrepresented the method by which it would select FX rates for payment cardholders' foreign transactions. Through the Visa Rules, Visa required member banks to state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate in effect for the processing date. However, Visa did not impose such rates and, instead, selected FX "rates" higher than wholesale market rates. The Visa Rules and Cardholder Agreements did not disclose that Visa would, in fact, impose rates higher than wholesale market rates. Visa's representations, omissions, and practices were likely to mislead a reasonable consumer into believing that Visa would impose FX rates that were wholesale market rates, when Visa instead selected higher rates—not authorized by the Visa Rules or Cardholder Agreements, nor reasonably related to Visa's costs or risk associated with exchanging foreign currencies—for the sole purpose of maximizing Visa's profits.

224.   Visa's conduct was unfair because it was immoral, unethical, oppressive, or unscrupulous and caused substantial injury to consumers. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Visa's profits, without regard to what normal wholesale market conditions would produce.

225.   Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were entirely outside the range of wholesale market rates. On other dates, the rates imposed were at the extreme ends of

-48-

the daily ranges wholesale FX market rates such that the resulting "spread" was larger than that found in the wholesale markets.

226.   Visa's conduct is effectively hidden from consumers. While Visa purports to post the FX rates it selects on the Visa website, Visa does not require issuing banks to inform cardholders that the FX rates are available online. Nor does Visa disclose in the Visa Rules that the FX rates it imposes are online. Moreover, cardholders have no reason to believe that Visa is imposing worse FX rates than what it promised and, therefore, even if cardholders knew they could find the Visa FX rates online, they would have no reason to check the rates shown on the Visa website against the wholesale market rates. Moreover, cardholders have no way of knowing, before engaging in a foreign transaction, what rate Visa will apply to the transaction.

227.   Plaintiff Chakraborty and members of the Massachusetts Class were injured in the form of overcharges on FX payment card transactions.

228.   Plaintiff Chakraborty and members of the Massachusetts Class relied on their billing statements from their issuing banks, which set forth the amounts charged or owed for their transactions. Having no reason to believe that the FX rates selected by Visa and applied to the transactions on their billing statements were anything other than wholesale market rates selected in good faith, Plaintiff Chakraborty and members of the Massachusetts Class paid the amounts charged on their billing statements.

229.   Plaintiff Chakraborty and members of the Massachusetts Class have suffered a loss of money or property as a result of Visa's deception and unlawful conduct, in that they incurred overcharges on foreign currency payment card transactions that they otherwise would not have incurred in the absence of Visa's unlawful conduct. Their losses were a foreseeable result from Visa's conduct. Had Visa applied the FX rates that had been represented—*i.e.*, wholesale market rates—Plaintiff Chakraborty and members of the Massachusetts Class would have paid less for their foreign transactions.

230.   Visa's practices of applying overcharges to payment cardholders' foreign currency transactions was continuous throughout at least the relevant period.

231.    As a result of Visa's violations of the Massachusetts Consumer Protection Act, Plaintiff Chakraborty and the Massachusetts Class seek all available damages, including treble damages, punitive damages, and attorneys' fees and costs.

232.    Visa has been mailed a demand letter in accordance with Chapter 93A. More than thirty days has passed since such demand letter was mailed, and Visa has failed to make a reasonable settlement offer in response.

**FIFTH CLAIM FOR RELIEF**
**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1,** *et seq.*
**(On Behalf of Plaintiff Delacruz and Proposed New Jersey Class)**

233.    Plaintiff Delacruz incorporates each allegation above as if fully set forth herein.

234.    The New Jersey Consumer Fraud Act prohibits "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate" in violation of N.J. Stat. Ann. § 56:8-2.

235.    Visa's conduct alleged herein violates the New Jersey Consumer Fraud Act.

236.    Visa engaged in conduct that is unconscionable, deceptive, and fraudulent including but not limited to making misrepresentations and omissions regarding the FX rates to be applied. Specifically, Visa misrepresented the method by which it would select FX rates for payment cardholders' foreign transactions. Through the Visa Rules, Visa required member banks to state in their Cardholder Agreements that the FX rates imposed on each member bank's cardholder customers will be either (1) a wholesale FX market rate, or (2) a government-mandated rate. However, Visa did not impose such rates and, instead, selected FX rates higher than wholesale market rates. The Visa Rules and Cardholder Agreements did not disclose that Visa would, in fact, impose rates higher than wholesale market rates. Visa's representations, omissions, and practices were likely to mislead a reasonable consumer into believing that Visa would impose FX rates that were wholesale

market rates, when Visa instead selected higher rates—not authorized by the Visa Rules or Cardholder Agreements, nor reasonably related to Visa's costs or risk associated with exchanging foreign currencies—for the sole purpose of maximizing Visa's profits.

237.   Visa's conduct was unconscionable and in violation of the public interest. Consumers reasonably expected that rates would not be imposed for the sole purpose of maximizing Visa's profits, without regard to what normal wholesale market conditions would produce.

238.   Visa benefitted from imposing such FX rates without assuming any corresponding risk because the transactions were being settled in U.S. Dollars, with currency obtained through other contemporaneous transactions, and/or with currency that had been purchased on the FX futures market. As alleged above, for a substantial percentage of all cardholder transactions during the relevant period, the currency conversion rates imposed by Visa on cardholder foreign currency transactions were entirely outside the range of wholesale market rates such that Plaintiff Delacruz and members of the New Jersey Class were injured in the form of overcharges on FX payment card transactions.

239.   Visa's conduct is effectively hidden from consumers. While Visa purports to post the FX rates it selects on the Visa website, Visa does not require issuing banks to inform cardholders that the FX rates are available online. Nor does Visa disclose in the Visa Rules that the FX rates it imposes are online. Moreover, cardholders have no reason to believe that Visa is imposing worse FX rates than what it promised and, therefore, even if cardholders knew they could find the Visa FX rates online, they would have no reason to check the rates shown on the Visa website against the wholesale market rates. Moreover, cardholders have no way of knowing, before engaging in a foreign transaction, what rate Visa will apply to the transaction.

240.   Plaintiff Delacruz and members of the New Jersey Class relied on their billing statements from their issuing banks, which set forth the amounts charged or owed for their transactions. Having no reason to believe that the FX rates selected by Visa and applied to the transactions on their billing statements were anything other than wholesale

1    market rates selected in good faith, Plaintiff Delacruz and members of the New Jersey Class

2    paid the amounts charged on their billing statements.

3            241.    Visa's practices of applying overcharges to payment cardholders' foreign

4    currency transactions was continuous throughout at least the relevant period.

5            242.    As a direct and proximate result of Visa's unlawful conduct, Plaintiff

6    Delacruz and members of the New Jersey Class suffered ascertainable losses in that they

7    incurred overcharges on foreign currency payment card transactions that they otherwise

8    would not have incurred in the absence of Visa's unlawful conduct. Had Visa applied the

9    FX rates that had been represented—*i.e.*, wholesale market rates—Plaintiff Delacruz and

10    members of the New Jersey Class would have paid less for their foreign transactions.

11            243.    As a result of Visa's violations of the New Jersey Consumer Fraud Act,

12    Plaintiff Delacruz and members of the New Jersey Class seek all available damages,

13    including treble damages, punitive damages, and attorneys' fees and costs.

14                             **<u>PRAYER FOR RELIEF</u>**

15         WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, ask

16    for judgment against Defendants as follows:

17            a.    Certification of this action as a class action on behalf of the proposed

18                 Classes;

19            b.    Designation of Plaintiffs as Class Representatives;

20            c.    Appointment of undersigned counsel as Class Counsel;

21            d.    Judgment in favor of Plaintiffs on all causes of action;

22            e.    Declaration that the practices complained of herein are unlawful;

23            f.    Injunction requiring Visa to cease and desist from engaging in the unlawful

24                 practices alleged herein;

25            g.    Damages in the form of all money improperly collected or received by Visa,

26                 and any applicable nominal, statutory, treble, or punitive damages;

27            h.    Disgorgement of all amounts improperly collected or received by Visa;

28            i.    An award of pre-judgment and post-judgment interest as provided by law;

1    j.   An award of attorneys' fees and costs; and

2    k.   Any further remedy the Court may deem just and proper.

3                    **DEMAND FOR JURY TRIAL**

4    Plaintiffs hereby demand a trial by jury on all claims so triable.

5    Dated: December 21, 2022                Respectfully submitted,

6                                            By:  /s/Ariana B. Kiener

7                                            Sophia Rios, SBN 305801
8                                            BERGER MONTAGUE PC
                                             401 B Street, Suite 2000
9                                            San Diego, CA 92101
                                             Tel. 619.489.0300
10                                           Fax 215.875.4604
                                             srios@bm.net
11
                                             E. Michelle Drake*
12                                           John G. Albanese*
13                                           Ariana Kiener*
                                             BERGER MONTAGUE PC
14                                           1229 Tyler Street NE, Suite 205
                                             Minneapolis, MN 55413
15                                           Tel. 612.594.5933
16                                           Fax 612.584.4470
                                             emdrake@bm.net
17                                           jalbanese@bm.net
                                             akiener@bm.net
18                                           *admitted *pro hac vice*

19                                           *Attorney for Plaintiffs*
20

21

22

23

24

25

26

27

28

-53-

THIRD AMENDED CLASS ACTION COMPLAINT, No. 4:21cv5302-YGR